**FREDERICK CHUSID & COMPANY,**
Plaintiff,

v.

**MARSHALL LEEMAN & CO., Inc., et al.,**
Defendants.

**67 Civ. 4148.**

United States District Court,
S. D. New York.

Jan. 29, 1971.

See also 279 F.Supp. 913.

Royall, Koegel, Rogers & Wells, New York City, for plaintiff; S. Norman Ostrow, James B. Weidner, New York City, of counsel.

Sol Nathan, New York City, for defendants; Slotnick & Narral, New York City, Barry Ivan Slotnick, Robert A. Katz, New York City, of counsel.

WYATT, District Judge.

This is the decision after trial, without a jury, of this civil action by plaintiff Frederick Chusid & Company (Chusid) against defendants Marshall Leeman & Co., Inc. (Leeman) and six individuals. There was no jury because no jury demand was served. Fed.R.Civ.P. 38(b).

Chusid and Leeman are competing enterprises which, so far as relevant here, offer to business executives counseling services intended to advance their careers. Chusid is the older enterprise. The individual defendants were employed by Chusid. There came a time in 1967 when certain of the individual defendants left Chusid and set up Leeman as a competing concern. This action followed.

The complaint was filed on October 25, 1967 and had ten claims. Each claim is in form directed against all defendants but the averments show that as to several claims this is not true as a matter of substance. The complaint set forth in substance the following situation.

Plaintiff Chusid is a Delaware corporation with principal place of business in Chicago. Chusid had a successful and profitable business with offices in Chicago, New York, Boston, Atlanta, Washington and elsewhere. Defendants Feren and Beers were employed by Chusid in New York, Thurman by Chusid in Boston, Connor and Shykind by Chusid in Atlanta.

Defendant Leeman is a New York corporation, organized in July 1967, with principal place of business in New York. Leeman has offices in New York, Boston, Atlanta, and Washington. Feren, Thurman, Beers, Connor and Shykind—the individual defendants (Johnson was added later)—are citizens of states other than Delaware and Illinois ("residence" is averred rather than citizenship but this is treated as equivalent).

The first claim avers that the individual defendants and Leeman conspired to destroy the business of Chusid in New York, Boston, Atlanta, Washington and elsewhere; that the individual defendants left the employ of Chusid; that they induced others to. leave the employ of Chusid; and that they set up competing offices of Leeman in Boston, New York, and Atlanta. There appears to be diversity jurisdiction of this claim. 28 U.S.C. § 1332.

The second claim avers that by false and fraudulent misrepresentations defendants have induced clients of Chusid to break contracts with Chusid; that defendants attempted to persuade a client of Chusid to become president of Leeman; that Leeman obtained a telephone number in New York similar to that of Chusid; that the telephone of Leeman is answered in such a way as to cause clients of Chusid to believe they are talking to Chusid; that defendants have maliciously interfered with the business of Chusid; and that in the operation of Leeman defendants are using trade secrets of Chusid, knowledge of which was acquired by the individual defendants when they were employed by Chusid. There appears to be diversity jurisdiction of this claim.

The third claim avers that, knowing of their contracts of employments, defendants have enticed, and attempted to entice, employees in the New York office of Chusid to leave that employ and work for Leeman. There appears to be diversity jurisdiction of this claim.

The fourth claim avers that defendant Feren induced defendant Thurman to break an employment contract with Chusid and to accept employment with Leeman; that defendants Feren and Thurman induced defendant Connor to break an employment contract with Chusid and to accept employment with Leeman; that defendants Feren and Connor induced Slayman to break an employment contract with Chusid and to accept employment with Leeman; and that defendants Feren and Thurman induced defendant Beers to break an employment contract with Chusid and to accept employment with Leeman. There appears to be diversity jurisdiction of this claim.

The fifth claim avers that defendants, by conduct substantially as charged in the first four claims, have violated the Sherman Act (15 U.S.C. § 1). Jurisdiction of this claim appears to be conferred by the antitrust laws (15 U.S.C. § 15).

The sixth claim avers that defendants, by conduct substantially as charged in the first five claims, have engaged in unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45). There appears to be federal question jurisdiction of this claim (28 U.S.C. § 1331).

The seventh claim avers that Chusid has registered copyrights to "various psychological tests, * * * questionnaires, instructional material, and promotional literature." It is charged that Leeman has infringed these registered copyrights by copying the works and that all defendants have engaged in unfair competition by using copies for their profit. There appears to be jurisdiction of this claim as one in copyright and related unfair competition. 28 U.S.C. § 1338.

The eighth claim avers that Chusid has common law copyright in the works described in the seventh claim. It is charged that Leeman has infringed these common law copyrights by copying them and has also engaged thereby in unfair competition. There appears to be diversity jurisdiction of this claim.

The ninth and tenth claims aver that defendants Feren and Beers, respective-

ly, violated several provisions of their employment contracts with Chusid, in that they worked for Leeman as a competitor in breach of a restrictive covenant, in that they did not deliver to Chusid on termination of their employment trade material belonging to Chusid, in that they have revealed trade secrets of Chusid to advance the business of Leeman, and in that they have solicited clients of Chusid from client lists obtained while employed by Chusid. There appears to be diversity jurisdiction of these claims.

The relief demanded is an injunction, actual damages of $500,000, exemplary damages of $1,000,000, an order for production of copyrighted material for impounding and destruction, and for costs and attorney's fees.

Two days after filing the complaint, Chusid obtained an order requiring defendants to show cause why there should not be a preliminary injunction.

On November 20, 1967, defendants filed a joint answer which essentially was a general denial; there were two affirmative defenses which attacked as unenforceable the restrictive covenants signed by defendants Feren and Beers; there was an affirmative defense that Chusid's forms, brochures, business techniques, and the like, were not entitled to trade secret protection.

After a number of adjournments, the motion of Chusid for a preliminary injunction was heard by Judge Mansfield on November 28, 1967.

On January 26, 1968, Judge Mansfield filed his opinion granting in part and denying in part the Chusid motion. The opinion is reported at 279 F.Supp. 913.

Judge Mansfield found that the five individual defendants "left [Chusid's] employ at approximately the same time pursuant to an understanding between at least some of them, to establish a competing business of the same type, using and plagiarizing materials and forms taken from [Chusid], seeking to induce others to leave [Chusid's] employ and join them, and causing some confusion by obtaining a telephone number for their newly established business that was almost identical to [Chusid's] number." Judge Mansfield declined to enforce restrictive provisions in the employment contracts of Feren and Beers because their services "are neither unique nor extraordinary"; he declined to enforce the trade secret provision of the employment contracts as to certain materials because "the materials were distributed by plaintiff to as many as 17,000 individuals". As to other written materials, Judge Mansfield granted injunctive relief under the employment contracts and on copyright grounds. He also ordered an injunction against soliciting employees to leave Chusid, conduct which he found was a breach of a "good-faith duty". Judge Mansfield declined to enjoin solicitation of Chusid's customers because he found little to show that defendants were using Chusid's lists to do so and he felt that an injunction in this respect would be "premature".

The order of preliminary injunction was filed on February 14, 1968. Defendants were enjoined "(1) from copying or using in any other manner [Chusid's] forms, brochures and pamphlets that defendants acquired while in the employ of [Chusid] and (2) from soliciting or enticing [Chusid's] employees to leave their employment". Chusid was required to give security of $10,000.

On February 21, 1968, by leave of Judge Cooper on stipulation, Chusid filed an amended complaint. Johnson, a citizen ("resident" is the averment) of New York, was added as a defendant with averments that he had been employed by Chusid in its New York office under an employment contract, that Feren and Thurman had induced Johnson to break his contract and to transfer from Chusid to Leeman, and that Johnson (with other defendants) was violating his fiduciary duty to Chusid. The amended complaint added the name of Johnson to various averments in the complaint. The amended complaint added that Chusid had obtained copyright registration certificates for various works, including "Personal

Data Form" and "The Twelve Steps to Successful Executive Marketing". The amended complaint added an eleventh claim based on averments that Johnson had an employment contract with Chusid and violated it (the eleventh claim is similar to the ninth and tenth claims involving Feren and Beers, respectively).

On March 6, 1968, defendants filed a joint answer to the amended complaint; the answer was essentially a general denial with the addition of supplementary averments to the affirmative defenses set forth in the answer to the complaint.

Chusid on May 8, 1968 obtained an order requiring defendants to show cause why they should not be held in contempt for violation of the preliminary injunction and why a further preliminary injunction should not be granted and other relief given. The moving affidavits showed that defendants had been enticing away Chusid employees while the motion for a preliminary injunction was under advisement by Judge Mansfield, were continuing in attempts to entice, were disparaging the business of Chusid; it was shown that Leeman had only hired persons who had worked for Chusid.

Argument on the motion to punish for a further preliminary injunction, etc. was heard on May 16, 1968. After some argument, a hearing on the motion was ordered to begin on May 27.

The hearing began with the taking of evidence on May 27. On that day the Court discussed with counsel (SM 172–179(a)) whether to order trial of the action on the merits advanced. Fed.R. Civ.P. 65(a) (2). The discussion continued the next day and on that day, without objection by counsel the trial of the action was ordered to be advanced and consolidated with the hearing of the application for a further preliminary injunction (SM 183).

On May 31, during the trial, an order was signed and filed enjoining Leeman and the other defendants from employing any employees of Chusid or from communicating with any Chusid employees about terminating their employment with Chusid or becoming an employee of Leeman. The order recited, among other things, that "the status quo existing prior to the filing of the complaint in this action ought not be altered".

The trial then continued, with necessary interruptions, until its conclusion on October 30, 1968.

Meanwhile, on June 13, 1968, defendants were granted leave to serve an amended answer and such amended answer was served on July 17 and filed on July 18, 1968. This amended answer contained a seventh defense that the employment contracts could not be enforced because the defendants "did not receive fair, equitable or substantial consideration". On motion of Chusid and on August 21, 1968, this seventh defense was struck out as legally insufficient (SM 1004–1012). The principle applied was that "the courts will not inquire into the adequacy of the consideration". Mandel v. Liebman, 303 N.Y. 88, 93, 100 N.E.2d 149 (1951).

## 1.

Chusid, itself or through subsidiaries, operates a business which, as relevant here, sells career counseling services to business executives. The business was founded about 1957 by Frederick Chusid (Fred). The corporation was organized in May 1962 and all its stock is owned by Fred.

As the size and complexity of business in this country have grown, there has come into being a numerous class of corporate managers (there are said to be over 500,000 in the country). These naturally have many career problems: should they change companies? how can they secure promotion in their own company? how can they be happy in their own company? what can they do best? There are any number of others. If for any reason a corporate manager is out of a job, he wants to know how he should go about getting a good one. Chusid and its competitors, for a fee, help to solve the problems. They may be called career

consultants. They direct themselves to the middle (and most numerous) group of business executives—those earning or capable of earning from $12,000 to $35,000 a year. New York is the largest relevant market.

Chusid was one of the first career consultants and became one of the largest and most successful.

Chusid developed for its business a method or system which, while not unique in its parts, is as a whole distinctive to Chusid.

Prospective clients are attracted by advertising, predominantly in the New York Times and the Wall Street Journal; sometimes clients are referred to Chusid by others.

Chusid has three groups of principal employees: "account executives", "business consultants" and "psychologists".

Account executives are salesmen whose job is, by interviews with the prospective client, to sell the services of Chusid and bring about a written contract between the prospect and Chusid. The prospect then becomes a client, promising to pay a fee. The salesmen are paid a percentage commission of the fee amount.

The business consultant is ideally a man who has had considerable business experience as a successful manager.

The psychologist has been educated as such and has become familiar with the techniques of clinical counselling or industrial psychology; he specializes at Chusid in the job-oriented problems of the middle management group. Nearly all Chusid psychologists have a Ph.D degree in psychology.

Salesmen and consultants are secured by Chusid from responses to advertising for them. When about 300 applications (with career summaries) are received, they are then screened for the best possibilities and some 65 to 75% are eliminated. The rest are then interviewed at a Chusid office and those who are found acceptable complete a "personal data form" and a number of psychological tests. These are then evaluated and about 50% of the then applicants are

eliminated. The survivors are interviewed by senior executives, often by Fred himself. Offers of employment are then made to some and accepted by some. In this way, two or three persons are hired by Chusid from the original 300 group. They are normally 40 years or older. What is looked for as to salesmen is sales experience, preferably with intangibles (insurance, mutual funds, etc.). What is looked for as to consultants is supervisory business experience, the broader the better.

Salesmen are trained by acquainting them with Chusid services through observation of experienced salesmen at work and through two seminars of one week each. They are paid on a commission basis and may within a matter of a week or two begin making sales themselves and being paid commissions. It cannot be determined how long a salesman is "trained" because there is no fixed period. He represents an expense to Chusid, as nearly as can be determined, for about one month.

Consultants are trained in substantially the same way, by observation and seminars, and there is no fixed period for their training although a "graduation" ceremony is observed. As nearly as can be determined, they are a net expense to Chusid for about one month.

Psychologists have a recognized professional discipline and require only to become familiar with the client types and their kind of psychological problems. There is nothing on which it can be found that there is any period during which they are a net expense to Chusid.

When a prospective client first makes contact with Chusid, a secretary or receptionist arranges an appointment on a future date with a salesman.

When the prospect comes in, he is given to read a large leather bound book entitled "You and Your Future in Business" (within Chusid called the "A Book"). This emphasizes that career advancement and satisfaction is a complex matter and that Chusid can help with expert advice. The prospect reads

the A Book before his interview with the salesman. This book is not permitted to be taken from the reception room and is retrieved by the receptionist as the prospect is taken to meet the account executive; it contains no notice of copyright.

At the initial meeting, the salesman explores the background of the prospect and his career problems; he then stresses the value of Chusid's services in the context. At the completion of this first interview, which often lasts for two hours, the prospect is asked to return for a second interview and, if married, to bring his wife along. Before leaving the first interview, the prospect is handed one or more of the following: a book called the "wife book" (describing Chusid's services), a book entitled "Meet the Staff of Frederick Chusid & Company" (which contains pictures and brief biographies of Chusid's non-clerical staff), a thin pamphlet entitled "Motivational Analysis", and copies of various Chusid newspaper advertisements.

The Chusid prospects have an average age of about 41–42 years and their average income is about $15,000–$16,000 per year. About 75%–80% of the prospects return for a second interview. When the prospect returns for a second interview, he and his wife are given to read a "B Book" similar to the "A Book" and which was also picked up before the end of the second interview.

There is evidence that shortly before September 1968 Chusid withdrew from use its A and B Books because Leeman had copied them; whether in any revised form they are now used does not appear.

At the second interview, the salesman summarizes what had been earlier discussed and recommends a "program" which he "feels will help to solve the prospective client's problem". The "program" is embodied in a four page brochure, the last page being a contract. The average cost of a Chusid program is about $2,000.

There may be further interviews between the salesman and the prospect.

If the prospect signs a contract for a program, he then becomes a client and his contacts with the salesman almost entirely cease until the completion of the program.

The client first completes several assessment materials in the Chusid offices. This is supervised by a secretary or other clerical employee, sometimes called a "T Girl" (presumably the "T" is for "Test"). Completion of these materials takes 8 to 10 hours.

There is a "Personal Data" form of four pages which carries a copyright notice dated 1961. This is the only Chusid material as to which there is a claim of infringement of statutory copyright.

Next, the client takes a "Thematic Apperception Test", consisting of a series of ten uncaptioned ambiguous pictures bound in a black leather binder. The client must write, on paper supplied, his interpretation of each of the pictures.

Next, there is an "Incomplete Sentence" test, a folder with three pages of sentence beginnings, to be completed.

Next come two related tests, each consisting of a sheet of blank white paper with instructions at the top. The first requires the client to draw a person and the second requires him to describe the person he has drawn.

Next is another test on a sheet of blank white paper; this requires the client to describe a day in his life ten years in the future.

Next, the client is given two booklets, in blue covers, one entitled "Career History", the other "Career Views". These are questionnaires designed to elicit information about the client's work history, abilities, and job-oriented attitudes.

The foregoing are the tests taken in the Chusid offices.

The client is then given two other booklets, also in blue covers, the one entitled "References", the other "Personal Contact List". These seek to elicit the information indicated by their titles and are permitted to be taken home by the client to be completed and returned at a later date.

After completion, the assessment materials (which would not seem to include the two last described blue books) are forwarded to a Chusid psychologist for evaluation. Having completed his evaluation of the assessment materials, the Chusid psychologist then meets with the client to discuss the results.

This meeting between the psychologist and client is called at Chusid a "Personal Assessment Conference" or PAC. It is the client's first meeting with non-clerical staff after he has signed a contract. At this meeting, the psychologist "confronts" the client with the results of the psychological tests. This technique —telling the client the results of the tests before therapy sessions are held— usually takes about two and one-half hours and is said to speed up the process of analysis and to result in a saving of time and money to Chusid.

After the PAC, the next meeting with the client is called the "Career Planning Conference" or CPC. This meeting is between the client, the same Chusid psychologist, and a Chusid consultant. The consultant serves as a kind of interpreter between the client and the psychologist and relates to the client and his world. The consultant works with the psychologist in assisting the client to develop his career plans.

Prior to the CPC, the consultant knows nothing about the client. At the CPC, the consultant asks the client to summarize what he has learned at the PAC. The psychologist then elaborates and organizes the material in categories useful to the consultant. After this, all three discuss the client's career problem and establish the goals to be sought and (at least tentatively) define the methods to be used to achieve them.

Although available upon request, the psychologist does not usually see the client after the CPC until the completion of the consulting period when there is an evaluation meeting between the psychologist, the consultant and the client. Also, the psychologist performs a mid-program review at which he may, at his discretion, request the client to be present.

Following the CPC, there are a series of meetings, usually twice a week, between the client and consultant. The first of these is a "planning conference" at which the consultant suggests concrete activities to achieve the goals defined and to effectuate the methods discussed at the CPC. The meetings then relate to the carrying on of these activities. Some of the techniques used by the consultant are: helping the client write a summary of his education and experience; deciding which want ads to answer; writing "motivational letters" (essentially letters designed to promote interest in an interview with the client); contacting anybody known to the client who may be of use to him in achieving his goals; and training the client for interviews.

At a final evaluation, the consultant and the psychologist help the client to decide what course to take, that is, to accept a job outside his company, change positions in his company, change location, or keep the same position and location but adopt a different attitude. (It is estimated that 30–40% of Chusid clients change their employment.)

At the end of the Chusid program it is hoped that the essential goal of enabling the individual to lead a happier life in business has been accomplished.

As already noted, the Chusid methods made the business successful. From the small office in Chicago in 1957 with sales that year of about $30,000, Chusid grew to some 18 or 20 offices in principal cities, with sales in 1968 of about $5,-000,000. Net profits went from a modest amount in the beginning to over $250,000 annually.

### 2.

The scheme which led to the present lawsuit was one by several Chusid employees to make more money for themselves by leaving Chusid and forming a business in competition with Chusid in which they could make use of the methods learned at Chusid. The scheme

was planned and carried out, to the extent possible, in secret so far as Chusid was concerned.

Defendant Feren was employed by Chusid as a salesman in its New York office. He began with Chusid on August 31, 1965 after signing an employment agreement. He later signed at least one superseding employment agreement. The agreement relevant to the period in suit was signed by Feren under date of March 15, 1967 (Ex. 95–B).

Defendant Thurman was employed by Chusid as a salesman in its Boston office, one from which sales were made but no services performed (these were normally performed by the New York office for clients sold from Boston). Thurman began with Chusid on or about August 24, 1965 after signing an employment agreement. He later signed at least one superseding employment agreement. The agreement relevant to the period in suit was signed by Thurman under date of May 6, 1966 (Ex. 95–D).

Defendant Beers was employed by Chusid as a salesman in its New York office. He began with Chusid on or about November 28, 1966 after signing an employment agreement dated November 11, 1966. He later signed at least one superseding employment agreement. The agreement relevant to the period in suit was signed by Beers under date of February 22, 1967 (Ex. 95–A).

Defendant Connor was employed by Chusid as a salesman in its Atlanta office. He began with Chusid on October 18, 1965 after signing an employment agreement. He later signed at least one superseding employment agreement. The agreement relevant to the period in suit was signed by Connor under date of May 2, 1966 (Ex. 99).

Defendant Shykind need be mentioned but briefly. He apparently had been employed for a period by Chusid as a consultant in its Atlanta office. He had been discharged, effective July 31, 1967. No evidence was offered to show that Shykind did anything in the premises until after his discharge nor was any evidence offered that Shykind did anything at any time to justify any decree against him. Counsel for plaintiff, instead of recognizing the obvious, have ignored it, have lumped Shykind with the other defendants, and even in an extensive memorandum after trial have asked relief against the defendants generally; for example, "for the confidential information and trade secrets stolen by the defendants" (Post Trial Memorandum, p. 141). This has imposed on the Court the heavy task of searching the spacious record to see if there is any evidence to support the claim against Shykind. There is none and the action must be dismissed on the merits as to Shykind. When reference is made hereafter to "defendants", the word does not include Shykind.

Defendant Johnson was employed by Chusid as a consultant in its New York office. He began with Chusid on September 6, 1966 after signing an employment agreement. He later signed at least one superseding employment agreement. The agreement relevant to the period in suit was signed by Johnson under date of February 22, 1967 (Ex. W).

All the employment agreements were terminable at will by either side.

Feren, Thurman and Connor were the best salesmen Chusid had. They sold $300,000 or over in contracts per year and earned between $35,000 and $40,000 annually.

After defendants had learned the Chusid business and its methods, they realized how profitable it was and they appreciated the possibilities of a competing business. Each from time to time considered these possibilities.

In June 1967, Feren began talking about the establishment of a competing business with Tudman, another Chusid salesman in New York. Tudman made projections of the income such a business might expect. Tudman also brought Beers into the discussions.

Feren telephoned Bell, who lived in Washington, was a retired Navy admiral

and had been a Chusid consultant until late April of 1967. Feren falsely represented that he was a "former" Chusid employee and attempted to get Bell to join the group in a "new company".

Feren talked by telephone to Thurman in Boston, asking if Thurman would be interested in joining a new enterprise; Thurman said: "count me in".

Feren, Tudman and Beers continued to discuss the project in the New York offices of Chusid and elsewhere. They talked of selling contracts somewhat lower in price than Chusid; of using the Chusid methods; of securing personnel from Chusid; and of the cities in which rival offices should be located. They talked to outside people who might invest money in the venture. There came a time, however, when Tudman decided he would not join the new company; he therefore dropped out of the discussions, all agreeing that everything would be considered confidential.

After continued talks by telephone to Thurman, Feren went to Boston on July 12, 1967. Thurman met him at the airport and in Boston they had a long talk about the new company. They talked about using Chusid methods, securing salesmen and consultants from Chusid, and about income projections Feren had made. They also talked about the name of the new company. The name "Marshall Leeman & Co." was devised. There is no person named "Marshall Leeman". Probably "Marshall" comes from Marshall Templeton, a Chusid official who hired Thurman for Chusid; probably "Leeman" is based on the names of Beers and Thurman. They also talked in Boston about getting Connor to join them.

Thurman telephoned Connor and arranged for him to join the group.

Feren, Thurman and Connor met on a Sunday in July 1967—probably July 16—at Maplewood in New Jersey near the Newark Airport. This was a long meeting and involved a final agreement and decision so far as the three were concerned. They evidently adopted the name. They agreed that Beers would come along and that Plouff, a salesman of Chusid at Chicago, should be invited to come along. Plouff, for some periods, had been the leading salesman at Chusid. They must have agreed that the group would leave Chusid, not at the same time but in succession; this was evidently to keep lines open into the Chusid organization so that personnel, information and materials could be obtained from Chusid for the benefit of Leeman; it also enabled the staff at Leeman to be built up gradually, in parallel to the build up of clients, while the group members continued for some time to draw money from Chusid; it also put Chusid at a disadvantage in that the extent of the disloyalty could not be known nor who would defect next. An understanding was reached that Feren would take a vacation or leave of absence from Chusid so he could work actively on the new company. They discussed the need of the new company for consultants, since the then members of the Leeman group were all salesmen. They evidently agreed to get consultants from Chusid because these knew the Chusid method.

Feren then asked for and obtained the approval of Chusid for a leave of absence, carefully concealing the fact that he had already decided to leave Chusid and go into competition. Feren at that time was having discussions with Ellis, a Chusid official who had found Feren out of harmony with the organization. Ellis told Feren in substance that he ought to work as a member of the team or leave Chusid. Feren said he would take a month to think about this; in fact, he wanted to work on Leeman without the knowledge of Chusid.

Feren now instructed a lawyer to incorporate Leeman. The certificate of incorporation was signed on July 20, 1967 and filed in Albany with the Secretary of State on July 21, 1967.

Thurman in Boston was at work to secure office space for Leeman there, under the cover of looking for Chusid. On July 20, 1967, Thurman went with a

broker to see space in a new building. The broker had told the building manager that the space was for Chusid. After seeing the space and talking to the manager, Thurman revealed to the broker that he was in fact looking for space for Leeman rather than Chusid. The broker insisted that this be revealed to the building manager, and this was done but on the basis that the building manager would not permit "the word to leak out".

After a series of telephone talks with Feren and Thurman, Connor talked to Plouff in Chicago on August 1. He had gone there on Chusid business and arranged (by telephone to Plouff at Plouff's home) to see Plouff on that trip, naturally away from the Chusid offices. They met in a nearby hotel so as to conceal their meeting from other Chusid people. Connor told Plouff of the new group and its plans and of the desire to have him in, running an office in Chicago. Plouff was agreeable to the idea.

In August 1967, Plouff in Chicago told Goldstein, one of his close friends in Chusid (a salesman), of the new company (in confidence, of course) and tried to get Goldstein to join up. Goldstein resisted.

In August 1967, Feren began looking in New York for office space for Leeman. He was in frequent contact with Beers, who went with him to several locations to inspect space. He also talked to Beers about getting employees from Chusid.

In August 1967, Feren also engaged an advertising agency, Simon, to prepare newspaper ads, brochures and the like. Feren gave Simon material to use in this connection and must have given him a great deal of material from Chusid, including Chusid newspaper ads, the Chusid A Book, the Chusid contract, etc.

On Sunday, August 20, 1967, there was another long meeting at Maplewood. Feren, Thurman, Connor, Beers, Plouff and Shykind attended.

An agreement was executed by Leeman (Feren signing as president) and Thurman, Beers, Connor and Beverly Feren (wife of Feren). The four individuals each made a capital contribution of $2500 to Leeman and became entitled each to 10 shares of the stock of Leeman. Certificates of stock were issued to the four stockholders but these were pledged to Leeman to secure an agreement by each stockholder to loan Leeman $7500. Provision was made for other persons to become parties to the agreement upon unanimous consent of the earlier stockholders. Plouff signed the agreement under an endorsement indicating that he would be part of the group (but issuance of stock to him was not specifically provided for) but would not be paid a salary until an office was opened in Chicago. (Shykind did not sign.)

At the August 20 meeting, Simon (and perhaps another agency) made an advertising presentation.

Agreements were reached in substance on the program of opening offices, the order in which they were to leave Chusid, the fees to be charged, the Chusid methods to be copied, the Chusid employees to be approached, the Chusid materials to be secured, etc.

In August 1967, a man named Shoor was living in Pawtucket, Rhode Island. Apparently he had been successful in his own business which had just been sold. Seeing a Chusid ad in the Wall Street Journal and after telephoning for an appointment, Shoor went on August 28, 1967 to the Chusid Boston office; his idea was possible new employment after disposal of his own business. Thurman at some length interviewed Shoor, who had brought with him brochures he had written, newspaper articles about him and the like. Thurman did not try to obtain Shoor as a client for Chusid. On the contrary, Thurman told Shoor that he and several other Chusid employees from other Chusid offices were forming a new corporation to do the same business as Chusid, that they were each very concentrated on their own special func-

tions, and that they needed some one to be president of the new corporation and pull the separate efforts together. They discussed the possibility that Shoor might be president of the new company. Nothing ever came of the idea and Shoor never became a client of Chusid.

Not long after August 20, Feren with the approval of Beers obtained and began using space at 717 Fifth Avenue. By an interesting and unlikely coincidence, the telephone number of these offices (shared with the earlier tenant) was 421–9600. The telephone number of Chusid in New York is 421–8600.

The arrangements for Leeman had now reached the point where Feren was to end his employment by Chusid (he had done no work for Chusid and had not been in the Chusid offices since his "vacation" began about a month before). Early in the morning of August 24, 1967, Feren sent a telegram of resignation to the Chicago office of Chusid. He stated that it would be effective in 30 days "as per my employment agreement" (in fact, there was no provision for any such notice) "or immediately if you so desire". The telegram stated that a "following letter" would explain his "reasons" but there was no following letter and, of course, the telegram did not reveal that Feren was to open a competing business.

On August 24, for the first time in about a month, Feren went to the Chusid office in New York. He gave copies of his telegram to some of the salesmen and secretaries. He says that at that time he told Chusid officials of his reasons for resigning but in any event he did not then tell anybody outside the Leeman group (or those they hoped to secure) that a competing business was to be launched. On this date of his resignation, Feren while at the Chusid office attempted to lay the foundation with Kuscher, a Chusid consultant, for securing Kuscher for Leeman. Without telling Kuscher his plans while he was at Chusid, Feren denounced the Chusid organization and said he had "something * * * in mind" for Kuscher and ar-

ranged to telephone Kuscher but to use the name "Finkel" so no one at Chusid could identify him.

Feren admitted that the Leeman group did everything possible to keep secret from Chusid management the plans for Leeman. Feren admitted that on August 24 he discussed with Chusid officials that he was going into a new venture but did not tell them it was to be a competing business.

Chusid, ignorant of the Leeman scheme, accepted Feren's resignation effective immediately, treated the parting as "amiable", and wished Feren "the very best of luck" in his "new venture".

A few days after August 24, Feren called Kuscher at Chusid, then took him to lunch at a place selected for secrecy, told him of the Leeman plans, told him Leeman had "pinpointed" several Chusid employees Leeman wanted, and that Kuscher was one of these. Later that day, he took Kuscher to the Leeman offices. There were subsequent telephone calls but Kuscher did not join Leeman.

Beers meanwhile was still at Chusid and was attempting to recruit a consultant for Leeman. He invited Rather to dinner and took him to the Leeman offices where they met Feren, who told him of the Leeman plans, that Chusid was an "insecure place" to work, that Leeman had its "pick of Chusid employees", and that Leeman wanted Rather as a consultant. Rather raised a question about the restrictive covenants in Chusid employment agreements. Feren "saw no obstacle". Rather did not accept the Leeman offer.

The time came for Thurman by plan to leave Chusid. On September 1, he sent a resignation by mail to Chusid in Chicago effective in 30 days or immediately at the option of Chusid. The reasons Thurman gave for resigning were false. He said nothing about Leeman.

About this time, Chusid became vaguely aware from members of its organization that Feren was attempting to at-

tract Chusid employees "in a furtive, secretive, and underhanded manner". Fred wrote Feren to this effect under date of September 8.

Chusid sent Stevens to Boston to relieve Thurman. This was done on September 12, at which time Thurman admitted that he was forming a new company.

On September 17, the first newspaper ads of Leeman appeared and on September 18 Leeman opened its doors for business. Feren and Thurman were there. Also employed by Leeman was Janice Klein who had been employed by Chusid until March 1967 and who had been at one time secretary to Feren at Chusid. There was another clerical employee at Leeman.

Leeman, now being in the open, others could begin leaving Chusid.

On September 18, Connor sent his resignation by telegram to Chusid in Chicago, effective in one week. Connor was in Atlanta; Slayman was a Chusid consultant there. On September 19, Slayman resigned from Chusid and left its Atlanta office. There is no direct evidence on the point but the only possible inference is that Slayman had been recruited for Leeman by Connor while they were both in the employ of Chusid. Their virtually simultaneous resignations must have been by plan.

Chusid sent Jordan to relieve Connor in Atlanta. This was done on Wednesday, September 20. By Monday, September 25, the Leeman office in Atlanta was open with Connor in charge. Very shortly, Connor hired Slayman as the Leeman consultant in Atlanta and while there is no direct evidence, this must have been understood between them before they left Chusid.

The group now believed that the time had come for Beers to leave Chusid. He therefore left Chusid on September 20 and on the following day began at Leeman. This did not prevent his speaking thereafter to a number of Chusid employees in an attempt to recruit them for Leeman.

Leeman opened an office in Washington, D. C. about October 1. Beers and Connor worked there off and on. It was intended that Shykind be a Leeman consultant in Washington but he saw no clients there.

On Friday, October 6, Johnson, a Chusid consultant in the New York office, left the office and the employ of Chusid. At the time he left, Johnson knew of the Leeman operation and, while there is no direct evidence, was undoubtedly solicited by Beers, Feren or others in the Leeman group. Johnson testified that he had submitted a written resignation to Chusid on September 20. This was denied for Chusid but it is not necessary to resolve the issue of credibility in this instance because it does not affect the result.

As a general observation, however, it must be found that the defendants and others allied with them, notably Plouff, shaped their testimony to whatever they believed would help their own interests and without any regard to the truth or to the sanctity of the oath taken.

On Saturday, October 7, undoubtedly by prearrangement, Johnson met with Feren and on Monday, October 9, began working for Leeman as a consultant.

This action was commenced on October 25 and while, as will later be seen, it tended to discourage the use of Chusid materials, at the same time it seems to have encouraged Leeman to entice Chusid employees and to widen its operations.

On December 6, Thurman opened a Boston office for Leeman and thereafter did his work for Leeman in Boston. It seems that Leeman finally turned down the office space for which Thurman had negotiated under a Chusid cover; the Boston offices of Leeman were opened in other space.

Giles, a Chusid salesman in New York, left Chusid in January 1968 as a result of the efforts of Leeman (principally Beers) and at once began on January 18, 1968 to work for Leeman in New York. Giles' testimony was that he left Chusid

of his own accord because he was unhappy there; this testimony is rejected as false and it is found that he left Chusid because he was induced by Leeman to believe that he would make more money at Leeman.

Haney, a Chusid consultant in New York, left Chusid on Friday, February 9, 1968, as a result of the efforts of Leeman (principally Johnson) and on Monday, February 12, began work for Leeman in New York (but has also worked in Leeman offices in Washington and Atlanta). Haney testified that he decided to leave Chusid first and thought of Leeman later; this testimony is rejected as false and it is found that he left Chusid because he was induced by Leeman to believe that he would make more money at Leeman.

Francis, Vincent and Weeks were three Chusid consultants who went over to Leeman in February 1968. There is no direct evidence to show why this happened but on the whole record it can only be concluded that they were induced so to do by Leeman.

Plouff meanwhile had continued to work for Chusid in Chicago as its leading salesman, or at least among its best producers. Secretly he had been a member of the Leeman scheme since August 1967, awaiting only the agreed time to leave Chusid and using his position at Chusid to benefit Leeman in every way he could. Plouff was one of the most brazen of those who testified falsely for defendants. He testified that he had not discussed Leeman by telephone or otherwise before January 8, 1968 (SM 95, 96, 101–103) whereas he had talked to Connor in person, to Connor and Feren by telephone, and to the others in the group at the Maplewood August 20, 1967 meeting. Indeed, he had signed the August 20 agreement of Leeman stockholders.

In December 1967, Plouff attempted to recruit for Leeman a Chusid salesman in Chicago, Goldstein. Plouff wanted Goldstein to join Leeman so that Leeman could open a Chicago office. In the same month, Plouff took Goldstein with him to an office building in Chicago where Plouff was negotiating for space for Leeman.

Before the end of the trial, counsel for defendants stated that he "could not vouch" for the "honesty" of Plouff. Feren in his testimony admitted that certain of the testimony of Plouff was false.

On Friday, January 5, 1968, Plouff without warning submitted his resignation to Chusid in Chicago and then flew to New York where he began work with Leeman on Monday, January 8. The Chicago office project for Leeman was not carried out and so far as appears Leeman never opened a Chicago office. Plouff worked for Leeman in New York but seems not to have acquired any stock interest in the company.

In March or April 1968, Connor sold his stock of Leeman to that corporation. Connor then caused to be organized a separate New York corporation called "Marshall Leeman & Company of Atlanta". Connor owns all the stock of this separate corporation which is affiliated with Leeman in the sense that there are agreements for use of name, cooperation, and the like.

As a result of the policy of Leeman to seek out Chusid employees, Leeman, until at least February 1968 had as salesmen and consultants only those who had been former Chusid employees. By May 27, 1968, Leeman had 17 salesmen and consultants, of whom all but 3 had been Chusid employees. Feren testified that up to December 31, 1967 Leeman had hired as salesmen and consultants only those who had been Chusid employees.

Leeman also secured Chusid psychologists. Dr. Saretsky left Chusid in January 1968 and was thereafter employed by Leeman. Dr. Didato was employed by Leeman, apparently as an independent contractor; he had been a Chusid psychologist.

There was considerable testimony by defendants and others that those who left Chusid did so because of conditions at Chusid which made them unhappy.

This testimony is rejected. There were no conditions at Chusid in any way abnormal, so far as working conditions were concerned. Those who left Chusid did so because they hoped to make more money with Leeman.

There was some testimony that Leeman methods differed from those of Chusid. Any differences were insignificant. The aim of Leeman was to copy so far as possible the methods and procedures used by Chusid and this aim was accomplished.

Until September 18, 1967, it was attempted by defendants to keep the Leeman scheme secret from the management of Chusid. Feren admitted that they did everything they could to keep it secret from the Chusid management (SM 2790).

### 3.

When Leeman began business on September 18, 1967, the defendants had secured at New York a quantity of Chusid forms and materials to use in their operations. Part of these were sent to Atlanta for use by Leeman there and part may have been sent to other Leeman offices. Because of the false and evasive testimony given for defendants about this matter, it is impossible to learn exactly how the property of Chusid was obtained. The detail is not of importance. The fact is that the material was stolen from Chusid and after this action was commenced its use was discontinued and the Chusid materials then on hand were destroyed to prevent detection.

After September 18, 1967 other forms and internal memoranda of Chusid were sent to Leeman by those in that group who had remained behind or by Chusid employees corrupted by defendants. To what extent these materials were used does not appear, but it is an unavoidable conclusion that they were used until detection was feared.

Leeman used the "Personal Data" forms of Chusid, simply cutting off at the bottom the name of Chusid and its copyright notice.

Leeman used a series of four "blue books" eliciting information about the client's career, etc. and his potential. Three of the four "blue books" appear to have been stolen from Chusid; either that, or they are exact copies of three of Chusid's four blue books. Leeman's fourth blue book, labelled "Business & Personal Accomplishments" differs from Chusid's fourth, which is entitled "References". However, Leeman copied as a separate paper, labelled "References", the substance and form of Chusid's fourth "blue book".

Leeman gave its clients a brochure entitled "You and Your Future" which copies the substance of the Chusid A Book.

The language of the Leeman contract and that of the Chusid contract are not the same but the rest of the four-page brochure of which the contract was the last page is substantially the same as the brochure used by Chusid for the same purpose.

The forms stolen from Chusid were used by Leeman at least until the commencement of this action on October 25, 1967.

At some time after the action was commenced, Leeman began to use its own forms instead of those stolen from Chusid. The Leeman forms cannot be called copies of those of Chusid but in substance they are largely the same.

The psychological tests given at Leeman were substantially the same and in the same order as those of Chusid. The Leeman client was given the same selection of pictures from the "Thematic Apperception Test" in the same order as given at Chusid. He was also given the same draw a person, describe the person you have drawn, and ten year projection test as given at Chusid.

At the beginning of its operations, the methods of Leeman were the same as those of Chusid. There have been changes because of this action but even after the changes the variations from Chusid are only minor.

#### 4.

Although the wrongful acts of defendants took place in at least four states other than New York, both plaintiff and defendants appear to assume that New York law alone governs the unfair competition, contract, and common law copyright infringement claims. It is concluded that, by whatever choice of law test is now dominant in New York, those issues are indeed governed by New York law. See Flexitized, Inc. v. National Flexitized Corp., 214 F.Supp. 664, 671–672 (S.D.N.Y. 1963), reversed on other grounds, 335 F.2d 774 (2d Cir. 1964), cert. denied, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965).

#### 5.

▉ Johnson, while employed by Chusid, was not a member of the Leeman conspiracy and was not disloyal. He allowed himself to be persuaded to leave Chusid which, of itself, was no violation of his contract with Chusid. But he left Chusid to enter into competition with Chusid and did so in violation of his agreement. He is liable, therefore, on the eleventh claim (for nominal damages, as will appear). Moreover, after joining Leeman and with knowledge of the misconduct of the other members of the group he actively participated in the interference with contract relationships between Chusid and certain of its employees. For this Johnson is liable in part on the first, third and fourth claims. The other claims must be dismissed as to Johnson on the merits.

#### 6.

The first, third and fourth claims are to a considerable extent duplicative and can be considered together. They also overlap parts of other claims.

▉ The basic assertion is that the defendants, while still employees of Chusid, were disloyal to their employer, organized a scheme or conspiracy to leave Chusid and open a competing business, carried out the scheme, copied the procedures and materials used at Chusid, violated thereby agreements with Chusid signed by them as well as duties of loyalty, and enticed employees of Chusid to leave Chusid and work for Leeman. The proof substantially establishes this assertion.

It is abundantly proved that defendants, while employees of Chusid, were disloyal to their employer and formed a scheme to compete with their employer. In the execution of this scheme, (a) they copied and made use of the methods and materials they had learned and known at Chusid, (b) they induced employees of Chusid to leave Chusid and work for Leeman, and (c) they received money compensation from Chusid while concealing from Chusid their disloyalty.

#### a.

As already found, defendants copied the methods and materials of Chusid.

A great deal of time and effort was spent by defendants in an effort to show that the Chusid methods and materials were not original or unique or trade secrets. This effort was to a large extent successful, but this does not decide the issue.

There are probably no "trade secrets" (in the technical sense) belonging to Chusid and the methods and tests of Chusid were used or known or both to many others. The combination, however, was distinctive to Chusid. Whether this alone would entitle Chusid to protection need not be decided. The fact is that defendants had by contract agreed that after termination of their employment with Chusid, they would not use any of the "information or materials" or "special knowledge * * * unique techniques, special selling or consulting procedures" learned at Chusid. The agreements with two of the defendants (Thurman and Connor) were for a two year period only and were slightly different in form from those with Feren and Beers; in substance they were the same and, moreover, Thurman and Connor aided and abetted the other two defendants in their violations and the result in any event would be the same.

# 1060

Judge Mansfield has already determined: "Under New York law the parties have the right by contract to prevent disclosure of such materials even though they are not secret or confidential and may indeed be a matter of public knowledge." (279 F.Supp. at 917).

The defendants have violated their agreements.

■ No injunction should issue as to the use by defendants generally of methods and procedures because there is no showing of injury irreparable by money damages.

■ There is no adequate proof, however, of money damage. The evidence offered for Chusid is entirely speculative. The specific offices involved were not isolated except for New York, and as to that office no comparative figures from prior years were proved.

It is doubtful that an accounting as to this aspect would be appropriate and in any event an accounting would be futile because it would be difficult if not impossible to determine what part of the profits, assuming there were such, resulted from the violations by defendants and what part from the personal energies and talents of defendants.

■ The situation seems appropriate for an award of punitive damages. Normally such damages are not awarded for breach of an ordinary commercial contract. The situation here, however, involves tort elements and abuse of confidence—the disloyalty of employees. Punitive damages are believed proper. 5 Corbin on Contracts § 1077 (especially at pp. 439–446)

Chusid may recover on this part of these claims $500 by way of punitive damages. No consideration has been given in this connection to the use by defendants of the "Personal Data" forms of Chusid or to the copying by defendants of the Chusid A Book; these are considered under other claims hereafter.

b.

The defendants persuaded employees of Chusid to leave Chusid and work for Leeman. These were Slayman, Johnson, Haney, Francis, Vincent and Weeks (consultants) and Plouff and Giles (salesmen).

Despite the differences between the case at bar and Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1949), the principles laid down in *Duane Jones* would impose liability here.

■■ Aside from *Duane Jones*, however, defendants would be liable for interference with the contract relationship between Chusid and its employees. True, these contracts were at will and ordinarily interference with at will relationships is not actionable. Such interference is actionable, however, when the means used are tortious, or the motivation is malicious, or there is a relation of confidence. A. S. Rampell, Inc. v. Hyster Company, 3 N.Y.2d 369, 376, 165 N.Y.S.2d 475, 481, 144 N.E.2d 371 (1957). In the case at bar, there was certainly a relation of confidence while any defendant remained in the employ of Chusid. This would apply to the enticement of Plouff, Slayman and Johnson. Under the circumstances here present, there would seem to be a relation of confidence as to the other Chusid employees induced to leave because defendants made use of information as to them obtained while they were employed by Chusid. Moreover, the motivation here—the carrying out a conspiracy by disloyal employees—would seem to be malicious.

Johnson is liable as to this part of these claims for the enticement of Francis, Haney, Vincent and Weeks. He was active in inducing them to break their agreements with Chusid not to compete and made use in so doing of information obtained while he was an employee of Chusid. He was at the time violating his own agreement with Chusid not to compete. Moreover, he

aided the others in the Leeman group in this part of their misconduct.

The question remains as to the remedy.

■ The extent of the successful and unsuccessful attempts by defendants to obtain employees from Chusid are persuasive that an injunction should issue restraining Leeman from employing any person employed by Chusid unless there is at least an interval of six months after termination of employment by Chusid before there is employment by Leeman.

■ Chusid is also entitled to money damages.

The damages to Chusid would appear to be. the cost of training replacements for those enticed by defendants.

Chusid failed to prove how much it cost to train replacements. By a process which defies repetition here, an accountant for Chusid gave a figure representing the cost of training one man at Chusid. His method was based on the total cost of training in the prior years, divided by the number of men trained in that year. The difficulty is that this method affords no way of calculating the cost of training one more than the number of men trained in the prior year. The testimony was that there was no significant fluctuation in recruiting and training effort during and after the period complained of, than existed in prior years. The costs of the training program such as rent, salaries, seminar costs, etc. are relatively fixed and the addition of additional trainees would not appear significantly to increase those costs.

There is, however, a cost for each trainee in the form of the allowance or salary during his training period. It has been found that the trainee salesman or consultant is an expense to Chusid for about one month. A salesman is paid $600 a month as "a draw or salary" (SM 1734). The average salary of a consultant is $10,000 per year (SM 1734).

The expense of training replacements for Plouff and Giles was $1200, that is, $600 × 2.

The expense of training a consultant for one month is $833.33 (one-twelfth of $10,000).

The expense of training replacements for Francis, Haney, Vincent, and Weeks was $3333 ($833.33 × 4 rounded off).

Chusid may have judgment against Feren, Thurman, Beers, Connor, and Johnson for $3333.

The expense of training replacements for Slayman and Johnson was $1667 ($833.33 × 2 rounded off).

Chusid may have judgment additionally against Feren, Thurman, Beers, and Connor for $2867 ($1200 in respect of Plouff and Giles plus $1667 in respect of Slayman and Johnson).

c.

■ Under New York law, a disloyal employee forfeits his right to compensation for services "and if he is paid without knowledge of his disloyalty he may be compelled to return what he has improperly received [citing cases]". Harry R. Defler Corp. v. Kleeman, 19 A.D.2d 396, 404, 243 N.Y.S.2d 930, 938 (4th Dept.1963), affirmed upon opinion below 19 N.Y.2d 694, 278 N.Y.S.2d 883, 225 N.E.2d 569 (1967). In the cited case, the date from which forfeiture for disloyalty was decreed was the date on which the certificate of incorporation of the competing business was filed. In the case at bar, that date was July 21, 1967.

The relevant dates are thus July 21, 1967, the date the certificate of incorporation of Leeman was filed, and the dates on which Chusid had notice of the disloyalty—September 12, 1967 in the case of Feren, Beers and Thurman; September 18, 1967 in the case of Connor.

The following amounts were paid during this period:

| | | |
|---|---|---|
| Feren | $1756.25 | (Ex. 97A) |
| Thurman | $1965.79 | (Ex. 97B) |
| Beers | $3886.82 | (Ex. 97C) |
| Connor | $5033.46 | (Ex. 97E) |

Under the decision cited, there seems no escape from the conclusion that Chu-

sid is entitled to a judgment against the defendants above named for the amounts indicated.

In this connection, the following language of Mr. Justice Gold is pertinent (Pictorial Films v. Salzburg, 106 N.Y.S. 2d 626, 632 (Sup.Ct.N.Y.County 1951)):

> "However that may be, the Court feels that it is not necessary to pass on what would ordinarily be the correct rule to apply, for the reason that before the advances were made to the defendants, they had already embarked upon the course of conduct which, when discovered, led to their discharge. Having already placed themselves in a position where they could not recover their stipulated shares of plaintiff's profits, they should not, in the Court's opinion, be allowed to retain what, if the facts had been known to plaintiff, it is reasonable to assume they could not have obtained from it. The law ought not and does not place a premium upon reticence and shrewdness in such circumstances."

#### 7.

The second claim is more of a hodgepodge than other parts of the complaint but it appears to be based on alleged interference by defendants with prospective clients of Leeman.

■■■■ There is no evidence of solicitation of prospective clients sufficient to establish this claim. There is evidence as to contacts with Haenlon, Lecker, deCaux, Fadiman, and Shoor but after reviewing this carefully it is concluded that no claim is proved.

As to other averments in this second claim, to the extent that they have any significance they are duplicated in other claims and are elsewhere considered.

#### 8.

The fifth claim is for money damages and an injunction for alleged violation of the antitrust laws, said to be Section 1 of the Sherman Act (15 U.S.C. § 1).

There might be a difficult problem of law as to this claim, as suggested by Judge Frankel in deciding a motion for summary judgment where the facts must have been very like those in the case at bar. Judge Frankel wrote (Vogue Instrument Corp. v. Lem Instruments Corp., 40 F.R.D. 497, 499–500 (S.D.N.Y. 1966):

> "There remains the postponed question whether, assuming the factual disputes to be resolved for plaintiff, the complaint really states a claim for relief under the Sherman Act. As appears from the forthright submissions on both sides, the case scarcely conveys to 'the expert feel of lawyers' * * * a sense of striking, or even familiar, Sherman Act implications. Suing under a statute, it bears remembering, conceived as a weapon against the power of 'trusts' and 'combinations,' * * * plaintiff appears to be the comparative giant seeking to suppress a young and infant competitor. And the 'restraints' alleged are a garden variety of unfair competitive practices reachable, and normally reached, under state rather than federal law. * * *

> "On the other hand, there is a small number of cases tending to support the complaint. Perryton Wholesale, Inc. v. Pioneer Distributing Co. of Kan., 353 F.2d 618 (10th Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966); Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879 (1st Cir. 1960); Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir. 1932). But cf. Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); * * *."

Judge Frankel did not dismiss the complaint because he felt that where there was a possible conflict with other Circuits, "the applicable rule of law should be designed after a trial"; he noted that "a trial may demonstrate that *Perryton* and the couple of cases resembling it are truly distinguishable" (40 F.R.D. at 500). This issue was never resolved because a stipulation and order of discon-

tinuance was filed and there was never a trial.

Fortunately the issue in the case at bar need not be resolved because the facts developed at trial establish that this particular case is distinguishable from the *Perryton, Atlantic Heel,* and *Albert Pick-Barth* cases cited by Judge Frankel. In all of the cited cases, an essential and emphasized element of the antitrust offense was that the conspiracy to solicit employees had the purpose or effect or both, of eliminating the plaintiff from competition. Thus, in *Perryton* it was said (353 F.2d at 622; emphasis supplied):

> "In the case at bar the intent of the conspiracy was to *eliminate* the competitor predominant in the area by the subversion of its employees. *Such elimination destroys rather than maintains competition,* is an unreasonable restraint on trade, and violates the statute."

In *Atlantic Heel,* the Court said (284 F.2d at 884; emphasis supplied):

> "Viewing the conspiracy alleged in the instant case, we believe that the *purpose of destroying a competitor* by means that are not within the area of fair and honest competition is a *purpose of destroying a competitor* by the Sherman Act."

In *Albert Pick-Barth,* the Court concluded (57 F.2d at 102; emphasis supplied):

> "If a conspiracy is proven, the purpose or intent of which is by unfair means *to eliminate a competitor* in interstate trade and thereby suppress competition, such a conspiracy we think, is a violation of section 1 of the Sherman Act."

The case at bar is different because the purpose and effect of the conspiracy here was not to eliminate Chusid as a competitor, but to establish Leeman, by unfair means, as a competitor. As far as the antitrust laws are concerned, competition has been increased because there is one more effective competitor. The evidence shows that there was never any danger that Chusid would be eliminated from competition and it was not the purpose of defendants to do so; they wanted merely to secure for themselves more money from the expanding market in which Chusid operated; their endeavors caused Chusid to be hurt but only lightly.

■ There having been no purpose nor effect to reduce competition, this fifth claim must be dismissed.

### 9.

The sixth claim is for money damages and an injunction for alleged violation of the antitrust laws, said to be Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45).

■ This claim is plainly without merit because there is no private action for damages under the "antitrust laws" for violation of the Federal Trade Commission Act. That Act is not one of the "antitrust laws" as defined in the Clayton Act (15 U.S.C. § 12). Cf. Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 375, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958). There is no private right of action under Section 5 of the Federal Trade Commission Act. Carlson v. Coca-Cola Co., 318 Supp. 785 (N.D.Calif. 1970).

### 10.

The seventh claim is that defendants infringed the statutory copyright of Chusid.

The proof offered was that Chusid used a "Personal Data" form, with copyright notice, and which was later registered for copyright (17 U.S.C. § 11). A certificate duly issued to Chusid, the application having been received on January 8, 1968.

■ Chusid complied in all respect with the federal copyright laws. The delay between first publication (in 1961) and the deposit of copies and registration of the form does not (despite the statutory requirement that copies be "promptly deposited" after publication

(17 U.S.C. § 13)) bar plaintiff from maintaining an infringement action for acts occurring prior to deposit. Washingtonian Pub. Co. v. Pearson, 306 U.S. 30, 59 S.Ct. 397, 83 L.Ed. 470 (1939).

■ Chusid is entitled to an injunction against any further use of its "Personal Data" form and to a requirement that defendants deliver up for destruction all the infringing copies (these include the "career profile analysis" forms such as Exs. 51 and 73) (17 U.S.C. § 101 (a) and (d)).

■ As to "damages and profits" (17 U.S.C. § 101(b)) there was no proof of any damages. It would be impossible to determine whether there were any "profits" even if an accounting were ordered. All that can be done is to award statutory damages of $1 for "every infringing copy made or * * * found in the possession of the infringer * * * * ". It is not shown how many such copies there were and destruction of the forms by defendants has made showing impossible. The record will support an inference that there were at least 100 such copies and surely defendants could not be heard to dispute this, since it was their wrongful act of destruction (to avoid detection) which deprived Chusid of evidence of the exact number of infringing copies.

Chusid may have judgment for $100 on this claim against all defendants other than Shykind and Johnson.

■ There is no provision in the Copyright Act for an award of exemplary or punitive damages.

## 11.

The eighth claim is based on alleged infringement of common law copyright. The materials for which common law copyright is claimed are in the complaint described only in general terms. They are specified in the "Post Trial Memorandum" as: the Chusid A Book, the "blue books", and some of the psychological tests—draw a person, tell a story about the person drawn, and tell what the client will be doing ten years in the future.

Common law copyright has been defined as "that right which an author has in his unpublished literary creations —a kind of property right—whose extent is to give him control over the first publication of his work, or to prevent its publication." Estate of Hemingway v. Random House, Inc., 53 Misc.2d 462, 464, 279 N.Y.S.2d 51, 54 (Sup.Ct.N.Y. County), aff'd without opinion, 29 A.D. 2d 633, 285 N.Y.S.2d 568 (1st Dept. 1967), aff'd 23 N.Y.2d 341, 296 N.Y.S. 2d 771, 244 N.E.2d 250 (1968). It is often referred to as "the right of first publication". Chamberlain v. Feldman, 300 N.Y. 135, 139, 89 N.E.2d 863 (1949); Pushman v. New York Graphic Soc'y, 287 N.Y. 302, 305, 39 N.E.2d 249 (1942).

If Chusid published any of these materials, common law copyright was lost.

■ Clearly Chusid did not publish its A Book because it was not permitted to be taken from the Chusid offices and was too much to be memorized. Clearly also the booklet "You and Your Future" was substantially a copy by Leeman of the Chusid A Book and "You and Your Future" was published by Leeman as an infringement of the common law copyright of Chusid.

■ Chusid is entitled to an injunction against any use by Leeman of the booklet "You and Your Future".

There was no proof of actual damage to Chusid. It would be impossible to determine whether there were any "profits" even if an accounting were ordered.

■ This does seem to be a case, however, where punitive damages should be allowed. It seems to be established in this Circuit that punitive damages may be allowed for infringement of a common law copyright. Smith v. Little, Brown & Co., 273 F.Supp. 870, 871–874 (S.D. N.Y.1967) affirmed 396 F.2d 150, 151 (2d Cir. 1968); Szekely v. Eagle Lion Films, Inc., 140 F.Supp. 843, 850–851 (S.D.N.Y. 1956) affirmed on other grounds, 242 F.2d 266 (2d Cir.) cert. denied, 354 U.S. 922, 77 S.Ct. 1382, 1

L.Ed.2d 1437 (1957). In the cited cases, punitive damages were not allowed. In a case some while ago, an award of punitive damages for infringement of a common law copyright was upheld in a reasoned opinion. Press Publishing Co. v. Monroe, 73 F. 196 (2d Cir. 1896) appeal dismissed 164 U.S. 105, 17 S.Ct. 40, 41 L.Ed. 367 (1896).

The copying of the A Book was deliberate and intentional. The A Book from which defendants copied could only have been stolen from Chusid or used secretly while the copier was employed by Chusid. This conduct is morally culpable and Chusid is entitled to punitive damages in the sum of $1000 against all defendants except Shykind and Johnson.

As to the other materials, it will be assumed that they were not published by Chusid so as to lose common law copyright. By the same token, they were not published by Leeman; they were available only to clients of Leeman who had paid (or agreed to pay) a fee and, if taken from the Leeman offices, were required to be returned. Thus, there being no publication by Leeman nor attempt to secure statutory copyright, there was no infringement of rights of Chusid. Estate of Hemingway v. Random House, Inc., above cited, 279 N.Y.S.2d at 55.

### 12.

The ninth claim is based on alleged violations by Feren of covenants in his employment agreement with Chusid.

One of the covenants is against competing with Chusid for two years after termination of employment. This covenant is as follows:

"In further recognition of all of the foregoing and in further consideration of your being employed you further agree that for a period of two years following the termination of your employment and within the geographical area specified below, you will not directly or indirectly, either individually or as a partner, stockholder, employee or any other capacity or relationship whatsoever engage in, obtain an interest in, or work for any Executive Search or Career Counseling firm, offering the same or similar services as the Company offers. The geographic area to which this Restrictive Covenant shall apply is: Borough of Manhattan, that being the actual area of operation of your activities within the Company."

Feren terminated his employment on August 24, 1967. This covenant was in effect therefore until August 24, 1969.

Such a covenant as has been quoted is valid if it is reasonable. Space and time are considered. The geographical area does not seem excessive, limited to the Borough in which Feren worked for Chusid. The time period seems reasonable. Considering the nature of the employment and its rewards, the use of the covenant seems reasonable.

The covenant would not be enforced by injunction, however, even if the time for enforcement had not expired. This is because the services of Feren were not special, unique or extraordinary. Purchasing Associates, Inc. v. Weitz, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245 (1963). Irreparable injury could not be shown.

But, the covenant being found valid, there is no reason not to award money damages. This seems to be clearly stated in 6A Corbin on Contracts § 1394 (p. 99).

"The fact that the employee has exceptional skill and that his services are unique or extraordinary should seldom be regarded as having any direct bearing on the question of illegality of a restraining provision. This fact is of great importance in determining whether or not the equitable remedy of injunction should be granted for enforcement of a contract that imposes no unlawful restraint. Even a valid contract will not be enforced by injunction unless irreparable injury is threatened and money damages would be an inadequate remedy; whereas a contract in illegal restraint of trade will be enforced by no remedy whatever."

The damages to Chusid from the breach of covenant by Feren are difficult to calculate with any exactitude. The breach was not in leaving the employ of Chusid but in immediately engaging in competition in the same geographic area.

 But since Feren left Chusid to go into competition, his leaving Chusid for this purpose was in violation of his employment agreement. It therefore seems fair and reasonable that Feren should at least be required to pay to Chusid the cost of training a replacement for him.

It has already been shown that this cost to Chusid was $600, for which there may be recovery from Feren.

The ninth claim asserts that Feren violated his contract by soliciting customers of Chusid. There is no proof of this.

The ninth claim asserts that Feren violated his contract by failing to return specified materials to Chusid and by using trade secrets of Chusid. To the extent that there was any proof in this area, the matter has already been covered.

### · 13.

The tenth claim is based on alleged violations by Beers of covenants in his employment agreement with Chusid.

The situation as to this claim is exactly the same as the ninth claim respecting Feren.

For the reasons given above, Chusid may recover from Beers on the tenth claim the sum of $600.

### 14.

 The eleventh claim is based on alleged violations by Johnson of covenants in his employment agreement with Chusid.

The situation as to this claim is substantially the same as the ninth and tenth claims respecting Feren and Beers respectively. There is a difficulty as to

damages, however, because the cost to Chusid of training a replacement for Johnson has already been awarded to Chusid under the first, third and fourth claims.

Nominal damages of $1 are awarded to Chusid against Johnson on the eleventh claim.

The foregoing contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

Settle judgment on notice.