**VOGUE INSTRUMENT CORP.,**
**Plaintiff,**

v.

**LEM INSTRUMENTS CORP., Frank Lowell, Robert Everett and Joseph Miele, Defendants.**

**No. 66 Civ. 91.**

United States District Court
S. D. New York.

July 8, 1966.

Landis, Carrow, Bernson & Tucker, New York City, for plaintiff.

Sidney S. Bobbe, New York City, for defendants.

## MEMORANDUM

FRANKEL, District Judge.

### I.

Relying exclusively upon Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) for the substance of its claim, and upon 28 U.S.C. § 1337 for jurisdiction, plaintiff sues for treble damages and injunctive relief under Section 4 of the Clayton Act (15 U.S.C. § 15). The allegations of the complaint are as follows:

Guidance Controls, Inc., was until July 1965 a separate corporation manufacturing, among other things, electric brakes and clutches used in space vehicles. In 1961 it became a subsidiary, and in July 1965 a "division" (no longer separate legally), of Warner Electric Brake & Clutch Company ("Warner"). On September 7, 1965, Warner sold the assets of the Guidance division to plaintiff, Vogue Instrument Corp., under a contract providing, *inter alia*, for plaintiff's payment to Warner of a percentage on Guidance sales during a stated period. From 1963 until the sale to plaintiff, defendant Lowell managed the Guidance division for Warner. Lowell never became plaintiff's employee, but, when Vogue acquired Guidance,[1] made an agreement with Warner providing that he would (1) continue for six months to receive salary and bonus from Warner at the former rate, approaching a total

---

1. Following the usage employed by plaintiff, this opinion refers from time to time to "Guidance" as such, disregarding its lack of separate legal existence after July 1965. This is purely for verbal convenience. It is not meant to suggest any view on the possible substantive significance of the fact that the name thus used refers to no entity and may ultimately mean different things in this litigation depending on the time to which reference is made.

of $50,000 yearly, and (2) serve as a consultant to plaintiff if and when requested to do so by Warner.[2]

Defendant Everett worked as production manager of the Guidance division until October 15, 1965, when he sent plaintiff a letter of resignation effective that day. Defendant Miele was chief designer for Guidance from 1962 until October 15, 1965, when he likewise resigned with a letter similar to Everett's.

The three individual defendants had agreed in writing, as part of the terms of their employment with Guidance, that they would assign their inventions, discoveries, and patents, and refrain from disclosing trade secrets learned in the course of their employment.

At some time before October 15, 1965, the complaint continues, the individual defendants agreed ("entered into a combination, understanding, concert and conspiracy") to set up their own business, and

(a) "while still employed by plaintiff VOGUE or by WARNER," to seek business from Guidance customers, particularly Leach Corporation, an Apollo Moon Project contractor to which Guidance supplied "tape recorder clutches and similar components";

(b) to have defendants Miele and Everett leave Guidance simultaneously on October 15, 1965;

(c) to have Leach terminate an existing contract with Guidance and transfer the business to defendant Lem Instruments Corp., formed by the individual defendants in October 1965;

(d) to disparage Guidance in solicitations of plaintiff's customers;

(e) to entice key Guidance employees to work for Lem;

(f) to appropriate and use "both physical and intellectual property" of

Guidance, "consisting of drawings, names and addresses of customers," and other "trade and business secrets and information" acquired by the individual defendants in their Guidance employment; and

(g) to do other things, "the details of which are not yet known to plaintiff, designed to destroy the business and the ability to compete of plaintiff * * *."

Continuing, the complaint alleges the interstate character of plaintiff's Guidance business; charges that defendants have by their wrongs caused plaintiff's loss of "a principal customer, LEACH CORPORATION, and therewith a quantitatively substantial, and qualitatively the most prestigious and important, part of its business"; asserts further that the Guidance division "is threatened with the entire loss and destruction of its business"; and says, perhaps conclusorily, that the conduct complained of is an unreasonable restraint of trade and a conspiracy to monopolize in violation of the Sherman Act's first two sections. The prayer is for damages in the sum of $750,000 ($250,000 trebled) and an injunction.

The amended answer, denying virtually all of the complaint's material allegations, contains a counterclaim by defendant corporation, alleged to be founded upon Section 1 of the Sherman Act, Section 3 of the Robinson Patman Act, and Section 4 of the Clayton Act (15 U.S.C. §§ 1, 13a, and 15). The counterclaim asserts that plaintiff, by various unfair tactics, including warnings to customers and prospective customers of the injunction sought in this lawsuit, caused Leach to cancel a contract with defendant Lem and contract with plaintiff for the same products to be supplied at unreasonably low prices. For this and other alleged wrongs that need not be detailed here,

---

2. The exact terms of this agreement—and whether it meant continued "employment" of Lowell by Warner for the six-month period—are disputed in the motion papers.

the defendant corporation asks damages of three times $500,000 and an injunction.

In late January of this year, the parties agreed that defendants would be deposed first. The depositions of defendants have been substantially completed. plaintiff's deposition—to be given by two officers named in counsel's agreement—has not been taken. Instead, claiming enough has been done to dispel any genuine issues of material fact, defendants have moved for summary judgment dismissing the complaint.

## II.

Postponing briefly the question of materiality, plaintiff has succeeded, we think, in demonstrating that the papers leave triable issues on at least the following questions:

(1) Whether the individual defendants agreed before October 15, 1965, to set up a business in competition with Guidance. Defendants have denied this in their depositions, but the facts are known peculiarly to them, the pattern of coincidence is arguably suspicious, and there is, in short, enough question to warrant a live trial if the issue is material.

(2) Whether defendants agreed and proceeded to attempt to lure away key Guidance employees.

(3) Whether defendant Lowell agreed with Warner, with plaintiff as prospective beneficiary, to serve as a consultant to plaintiff during the six months he continued to receive compensation from Warner.

(4) Whether Lowell also agreed to refrain during the same period from competing for Guidance business.

(5) Whether defendants have used any material or information fairly to be deemed "trade secrets" acquired in their Guidance employment.

(6) Whether defendants told Leach the plaintiff lacked technical skill and knowledge for, and had ceased to be interested in, the manufacture of electro-magnetic clutches.

While the opposed pleading allegations on the foregoing topics—and, perhaps, some subsidiary details of the same sort—are not at this stage resolved by "conclusive evidence supporting the [defendants'] theory" (Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)), this cannot be said with complete assurance to be the end of the matter. There remains the postponed question whether, assuming the factual disputes to be resolved for plaintiff, the complaint really states a claim for relief under the Sherman Act.[3] As appears from the forthright submissions on both sides, the case scarcely conveys to "the expert feel of lawyers", Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 150, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), a sense of striking, or even familiar, Sherman Act implications. Suing under a statute, it bears remembering, conceived as a weapon against the power of "trusts" and "combinations," see Apex Hosiery Co. v. Leader, 310 U.S. 469, 492–493, 69 S.Ct. 982, 84 L.Ed. 1311 (1940), plaintiff appears to be the comparative giant seeking to suppress a young and infant competitor. And the "restraints" alleged are a garden variety of unfair competitive practices reachable, and normally reached, under state rather than federal law. Cf. Julius Hyman & Co. v. Velsicol Corp., 123 Colo. 563, 233 P.2d 977, cert. denied, 342 U.S. 870, 72 S.Ct. 113, 96 L.Ed. 654 (1951); Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954); Harry R. Defler Corporation v. Kleeman, 19 A.D.2d 396, 243 N.Y.S.2d 930 (4th Dep't

---

**3.** As noted at the outset, plaintiff candidly acknowledges that this is the only basis for the action. Plaintiff has an-

other case against the same defendants in state court for unfair competition.

1963), appeal dismissed, 13 N.Y.2d 1174, 248 N.Y.S.2d 53, 197 N.E.2d 540 (1964).

On the other hand, there is a small number of cases tending to support the complaint. Perryton Wholesale, Inc. v. Pioneer Distributing Co. of Kan., 353 F.2d 618 (10th Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966); Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879 (1st Cir. 1960); Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir. 1932). But cf. Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); Hunt v. Crumboch, 325 U.S. 821, 826, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945); Apex Hosiery Co. v. Leader, 310 U.S. 469, 497–498, 69 S.Ct. 982, 84 L.Ed. 1311 (1940). Plaintiff places particular reliance upon the first of these, *Perryton,* which was decided after a trial, not on papers.[4] Defendants, undertaking to distinguish rather than to quarrel with that decision, are on shaky ground, largely because the effort requires them to treat as established their view of factual issues that remain triable on the contradictory affidavits before us.[5]

In this setting, there is persuasive reason for postponing a decision on the merits until it can be fashioned from the full and concrete detail of a trial record. A trial may demonstrate that *Perryton* and the couple of cases resembling it are truly distinguishable. Alternatively, it may leave us with the hard question whether the persuasive authority of those decisions should be deemed inconsistent with the controlling principles of the Sherman Act. In either event, where the problem involves the possibility of a district court's proposing a conflict with other Circuits, the occasion seems appropriate for holding "that the applicable rule of law should be designed after a trial." White Motor Co. v. United States, 372 U.S. 253, 261, 83 S.Ct. 696, 701, 9 L.Ed.2d 738 (1963); see also Southern Blowpipe & Roofing Co. v. Chattanooga Gas Co., 360 F.2d 79, 81 (6th Cir. 1966).

Accordingly, the motion is denied.

So ordered.

---

4. Indeed, counsel for plaintiff observed at the oral argument that but for the *Perryton* case, his "inclination would have been * * * to feel that this is not essentially a Sherman Act case * * *." Thereafter, in a letter retreating from that heroic concession, he invoked the two First Circuit decisions as adding to "a whole line of cases" supporting plaintiff.

Neither holding him to what he yielded orally nor following the rebound all the way, we find that the three cited precedents may fairly be read to favor plaintiff in the present posture of this lawsuit.

5. For example, the issue as to whether the individual defendants planned their competitive venture while at least two of them were still in plaintiff's employ.