**FASHION TWO TWENTY, INC.,**
**Plaintiff,**

v.

**Rudolph STEINBERG et al., Defendants.**

**No. 71 C 665.**

United States District Court,
E. D. New York.

Oct. 29, 1971.

Paul Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City by Jay Greenfield, New York City, of counsel, for plaintiff.

Shaw, Bernstein, Scheuer, Boyden & Sarnoff, New York City by Frederick B.

Boyden, New York City, of counsel, for defendants Marjo, Inc. and individuals.

Nickerson, Kramer, Lowenstein, Nessen & Kamin, New York City by Geoffrey M. Kalmus, New York City, of counsel, for defendants Steinberg and Jericho Laboratories, Inc.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, Chief Judge.

Plaintiff moves for a preliminary injunction. The defendants Marjo, Inc., Marvin E. Roseberry, Jo Roseberry, Finelle Industries, Maurice Feigenbaum, Dorothy L. Feigenbaum and Hal Hoham move to dismiss the complaint pursuant to Rule 12(b) of the Federal Rules of Civil Procedure claiming lack of subject matter jurisdiction and lack of original jurisdiction (as to all claims as they relate to the above-named individual defendants and as to the second and third claims as they relate to the corporate defendants.) Defendants also claim improper venue, and further request that certain matter be stricken from the pleadings as scandalous and improper.

The complaint alleges five claims. The first claim charges a violation of the Sherman Anti-Trust Act and the Clayton Anti-Trust Act (15 U.S.C. §§ 1, 15 and 26).[1]

The second claim charges unfair competition.

The third claim is for trade defamation.

The fourth claim is for misappropriation and misuse of trade secrets and the fifth claim is for breach of fiduciary duties by the defendant Steinberg.

Jurisdiction rests on 28 U.S.C. § 1337.[2] Additionally, jurisdiction for all the claims except the first stated claim is asserted under 28 U.S.C. § 1332(a) (diversity of citizenship).

The defendants Marjo, Inc., Marvin E. Roseberry, Jo Roseberry, Finelle Industries, Maurice Feigenbaum, Dorothy L. Feigenbaum, and Hal Hoham have moved to dismiss the action as against them. They challenge the subject matter jurisdiction of the court over the state claims, the personal jurisdiction over the defendants, both corporate and individual, and the venue of the action. In addition, if relief in the form of dismissal is denied, the above defendants request a transfer of the instant case as it relates to defendants Marvin E. and Jo Roseberry, Hal Hoham, and Marjo, Inc., to the Northern District of Indiana, and to the District of Massachusetts as it relates to defendants Maurice and Dorothy L. Feigenbaum and Finelle Industries.

### Subject Matter Jurisdiction

Examination of the complaint reveals five causes of action, only three of which need concern us here, the latter two relating solely to defendants Steinberg and Jericho Laboratories who do not join in the instant motion to dismiss. The first claim arises under the Sherman and Clayton Antitrust Acts, 15 U.S.C. §§ 1, 15 and 26. The first claim is the only federal claim. The second claim realleges all the facts pleaded in the first claim and states a cause of action for unfair competition and fraud. The third claim again realleges all the facts formerly pleaded, on which plaintiff bases a cause of action for trade defamation. These three claims involve all the defendants referred to above.

Defendants urge that the instant case is not one in which the court's power to exercise pendent jurisdiction should be invoked, and that the state claims should be dismissed. Standards for the exercise of pendent jurisdiction were set out by the Supreme Court in United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In that case, the court stated that a federal court has the power to hear and determine a state claim

" . . . whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Trea-

---

1. See Appendix A

2. See Appendix B

ties made, or which shall be made, under their Authority . . ., United States Constitution, Art. III permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. Levering & Carrigues Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming the substantiality of the federal issues, there is power in federal courts to hear the whole. 383 U.S. at 725, 86 S.Ct. 1138".

Under the standards of *Gibbs*, pendent jurisdiction is a proper exercise of the court's powers in the instant case, and the court thus declines to accept defendants' suggestion that it refuse to hear the state claims.

## PERSONAL JURISDICTION

Defendants challenge the personal jurisdiction over all moving defendants. As the arguments with respect to the individual and corporate defendants are different and involve different legal provisions, the court's discussion will be so divided.

a. The Corporate Defendants

Marjo, Inc. is a corporation organized under the laws of the State of Indiana, having its principal place of business at Fort Wayne in that State. Windham House, Inc., operating under the name of Finelle Industries, is a Massachusetts corporation, having its principal place of business within that State at Haverhill. Jurisdiction over Marjo, Inc., and Finelle Industries with regard to the first cause of action is conceded by the defendants. They argue, however, that personal jurisdiction over them for the second and third causes of action has not been obtained by plaintiff. They allege

that plaintiff has not properly served them with process in accordance with Rule 4 F.R.C.P., and that the state claims must thus be dismissed as against them.

Section 22 of Title 15, U.S.C., permits nationwide service of process on corporations in antitrust actions.

"District in which to sue corporation

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

Service in the instant case was had by serving process on officers of the defendant corporations within their respective states of organization, pursuant to 15 U.S.C. § 22. Whether or not such service is adequate with regard to other causes of action for which such service would not be permitted were they to be brought as separate actions, has been disputed. International Ladies' Garment Workers' Union v. Shields & Co., 209 F.Supp. 145 (S.D.N.Y.1962); Kappus v. Western Hills Oil, Inc., 24 F.R.D. 123 (E.D.Wis. 1959); Townsend Corp. of America v. Davidson, 222 F.Supp. 1 (D.N.J.1963); Stella v. Kaiser, 82 F.Supp. 301 (S.D. N.Y.1948).

■ Whether or not special service alone is adequate to confer personal jurisdiction over the defendant corporations on this court is a question which need not be decided, as this court finds that service was proper under Rule 4 F.R.C.P. with regard to the state claims standing alone. Under Rule 4(e), service may be made outside the state in which the court sits in two instances: first, whenever a statute of the United States or a court order so permits and second, whenever a statute or rule of court of the state in which the court sits allows it. Section 302 of the New York C.P.L.R. (McKinney 1970) permits New York courts to take personal juris-

diction over out-of-state individuals or corporations (and impliedly to serve them extraterritorially) in four instances, two of which are relevant here. These are (1) the transaction of business within the state, and (2) the commission of a tortious act outside of the state which causes injury to person or property within the state. As this court finds that defendant corporations transacted business in the state within the meaning of the statute, the second category, dealing with tortious acts, does not have to be discussed.

■■ It is quite clear that purchases, the only activity of the defendant corporations in New York, may constitute the basis for the transaction of business within a state. Eastern Pre-Cast Corp. v. Giant Portland Cement Co., 311 F.Supp. 896 (E.D.Pa.1970); Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 291 F.Supp. 252 (E.D.Pa.1968); Crusader Marine Corp. v. Chrysler Corp., 281 F. Supp. 802 (E.D.Mich.1968); United States v. Burlington Industries, Inc., 247 F.Supp. 185 (S.D.N.Y.1965). It is also quite clear that in considering the substantiality of business, the dollar amount is to be viewed from the standpoint of the average businessman, rather than from that of the corporate giant. Green v. United States Chewing Gum Mfg. Co., 224 F.2d 369, 372 (5th Cir. 1955); and Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 291 F.Supp. 252 (E.D.Pa.1968). Defendant corporations, as of the institution of the motion for preliminary injunctive relief, had purchased about $30,-000 worth of materials from defendant Jericho Industries in New York, sending their own trucks for pick-ups. This relationship and ensuing sales are continuing, and will probably grow in the future. On this factual basis, the court must find that defendant corporations have been and are transacting business within New York State under the meaning of § 302 New York C.P.L.R. (McKinney 1970). Thus the standards of Rule 4 F.R.C.P. are met, and personal juris-

diction over the corporations must be upheld.

b. The Individual Defendants

■ There are no separate provisions for the nationwide service of individuals in antitrust cases as there are for corporations. The usual rules must apply. The individual defendants here were served either in Indiana or Massachusetts. None of them has any significant contact with New York. Service on them must be looked at from the standpoint of Rule 4 F.R.C.P. directly. As noted in the prior section, Rule 4 permits jurisdiction to be taken over out-of-state persons when that is permitted under the state rules or laws of the state in which the court sits. Returning to § 302 of the New York C.P.L.R., we note again that the relevant provisions of that statute permit personal jurisdiction to be had over persons without the state if they have either transacted business within the state or committed a tortious act outside the state which has caused injury within the state.

The individuals may have transacted business within New York but the evidence shows that if they did so, they did so as agents of the corporate defendants. This, without more, will not suffice. United States v. Montreal Trust Co., 358 F.2d 239 (2d Cir.), cert. denied, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440, rehearing denied 384 U.S. 982, 86 S.Ct. 1858, 16 L.Ed.2d 693 (1966); Unicon Management Corp. v. Koppers Company, 250 F.Supp. 850 (S.D.N.Y.1966); Oil & Gas Ventures First 1958 Fund, LTD. v. Kung, 250 F.Supp. 744 (S.D.N.Y.1966); Krause v. Hauser, 272 F.Supp. 549 (E.D. N.Y.1967).

■ With regard to whether the individual defendants have committed a tort within the meaning of § 302 C.P.L.R., it is to be noted that an action alleging violations of the antitrust laws is a claim for injuries sustained, and therefore in the nature of a tort. *Cf.*, Albert Levine Associates v. Bertoni & Cotti, 314 F. Supp. 169 (S.D.N.Y.1970); Electric Theater Co. v. Twentieth Century-Fox

Film Corp., 113 F.Supp. 937 (W.D.Mo. 1953). Nevertheless, it is to be noted that none of the individual defendants have come to New York more than occasionally, and that the harmful results of which plaintiff complains did not occur in New York. As the New York Court of Appeals stated in Feathers v. Mc-Lucas, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), even where the results of the tortious act are felt in New York, the "mere occurrence of the injury in this State certainly cannot serve to transmute an out-of-state tortious act into one committed here, within the sense of the statutory wording." Consequently, unless some act is committed within New York by the defendants to which the appellation "tortious" may be attached, mere injury within the state is insufficient as a ground for jurisdiction. There is no evidence of any such act taken by the individual defendants themselves, and not as agents of their corporations. Jurisdiction is thus not present, and the action must be dismissed as to all the individual defendants with the exception of Steinberg.

### VENUE

■ Venue as to the remaining corporate defendants must be judged in the light of § 22 of Title 15, which states that

"Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business . . ."

As stated previously, defendant corporations have transacted business within New York by purchasing goods from defendant Jericho Laboratories. Sales, as opposed to purchases, of a similar size have been held sufficient to ground venue under 15 U.S.C. § 22. City of Philadelphia v. Morton Salt Company, 289 F. Supp. 723 (E.D.Pa.1968); School District of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1006 (E.D. Pa.1967); B. J. Semel Associates, Inc.

v. United Fireworks Mfg. Co., 122 U.S. App.D.C. 402, 355 F.2d 827 (1965). This court sees no reason to differentiate between the two. Defendants have not moved to dismiss for failure to state a cause of action, thus challenging the sufficiency of plaintiff's stated cause of action under the antitrust laws. This being so, they cannot challenge the applicability of 15 U.S.C. § 22, which, as can be seen, would permit venue to be laid in New York in the instant suit. With regard to the state claims, even were they to be considered separate and apart from the federal claim, the test applicable to them under 28 U.S.C. § 1391 does not differ substantially from the test in 15 U.S.C. § 22. The "doing business" test of § 1391 has been held to be essentially the same as the "transacting business" standard of 15 U.S.C. § 22. City of Philadelphia v. Morton Salt Company, 289 F.Supp. 723, 724 (E.D.Pa. 1968); State of New York v. Morton Salt Company, 266 F.Supp. 570 (1967 E.D.Pa.) and cases cited therein. Venue is thus proper for all claims against the remaining defendants.

### MOTION FOR PRELIMI-NARY INJUNCTION

A hearing was held on the preliminary injunction. Numerous affidavits, depositions and exhibits were submitted in addition to testimony. The court finds the following for the purposes of the motion:

Plaintiff was incorporated in 1962 in the State of Ohio under the name of Maw-Vack, Inc. Plaintiff later amended its name to Fashion Two Twenty, Inc. It became a publicly held corporation in the summer of 1969.

Plaintiff is engaged in the business of franchising distributors of its cosmetic and skin care products, which are sold under the Fashion Two Twenty label and various other trade names. These products are distributed through franchised distributors to other sub-distributors described as associate directors, managers and beauty consultants. Finally, the product is sold by beauty con-

sultants to consumers in their homes through a technique, characterized by the plaintiff as the "party plan". The "party plan" is a proven method of selling; the beauty consultant persuades a friend or acquaintance to invite the latter's friends to her home for a demonstration of the plaintiff's products. In return, the "hostess" receives a gift from the beauty consultant. When the "guest" makes a purchase at the "party", she becomes a customer of the beauty consultant. The sales of the plaintiff's products are promoted by offering the customer a "Glamor Case" free of charge if the customer purchases 16 specific products. The "Glamor Case" is an attractive makeup carrier in which 16 items fit in compartments shaped to hold the various items purchased.

At the time of the institution of this action, plaintiff had more than 100 directors, 400 associate directors and 18,000 managers and beauty consultants. The defendants Roseberry held a directorship, as did the defendants Feigenbaum. Each member of the chain of distribution signed an agreement incorporating plaintiff's rules and regulations. The rules and regulations are found in plaintiff's sales manual (the "How" manual) and regulations applying to the various links in the chain of distribution, *i. e.*, director, associate director, manager, beauty consultant, are specifically referred to therein.[3]

On March 5, 1965, plaintiff entered into a franchise agreement with Marvin and Jo Roseberry for a directorship covering Allen, DeKalb and Steuben Counties in the State of Indiana.

On March 10, 1965, plaintiff entered into a franchise agreement with Marjo, Inc. for a directorship covering the rest of the State of Indiana.

On September 1, 1968, plaintiff entered into a franchise agreement with Bertha B. Lampert[4] for a directorship covering the State of New Hampshire.

On July 1, 1963, plaintiff entered into a franchise agreement with Dorothy Distributors, Inc. for a directorship covering Essex County, Massachusetts and the Lowell Metropolitan area (which franchise was thereafter assigned by the corporation to Dorothy Feigenbaum personally on May 10, 1969, with the consent of plaintiff).

On December 18, 1963, plaintiff entered into a franchise agreement with Irlam Corporation for a directorship covering Barnstable and Plymouth Counties in Massachusetts. Irlam Corporation was owned by Bertha B. Lampert. On December 18, 1963 plaintiff entered into a franchise agreement with Irlam Corporation for a directorship covering eleven additional counties in the State of Massachusetts.

The franchise agreements are form contracts (a copy is set out in Appendix). Under their terms, the franchisor is granted the sole and exclusive right to sell plaintiff's products within the area described. The franchised director agrees not to compete in the same or similar type of business within the United States for a period of three years from the time of resignation or termination of the directorship.

The rules and regulations are incorporated by reference into the franchise

---

3. Each member agrees, "In consideration of the acceptability of the above qualifications . . . " to
 (a) purchase Fashion Two Twenty products in the manner set out in the sales manual, and to abide by the Rules and Regulations therein;
 (b) to fulfill all the requirements of all applicable laws at her own expense;
 (c) to be an independent contractor and not an employee of Fashion Two Twenty, and to hold Fashion Two Twenty harmless of any charges or expenses incurred in the sale and distribution of Fashion Two Twenty products; and
 (d) to have the application agreement become effective only upon the approval of plaintiff.

4. Mother of defendant Dorothy Feigenbaum.

agreement. The rules and regulations provide that the franchise distributors, managers and beauty consultants are independent contractors and not employees of the plaintiff. The agreement permits the plaintiff to cancel the agreement on 10 to 90 days notice to the franchise dealer in the event of breach, the period varying in each specific agreement.

## HISTORY OF PLAINTIFF

Maw-Vack, Inc., the name under which plaintiff was originally organized, was incorporated in February, 1962. Vernon G. Gochneaur, presently Chairman of the Board, was from the plaintiff's inception and at all subsequent times until 1968 president and chief executive officer. Gochneaur had had long experience in the field of door-to-door sales, although he had no prior contact with the cosmetics industry. Hal Hoham, a defendant in the instant action, had introduced Gochneaur to one Worrell, in Kentucky, who had made an attempt to start a direct sales cosmetics business but had failed.

Through Worrell, Gochneaur met Mrs. Aubrey McDonald, an experienced businesswoman who had severed her long prior connection with Stanley Home Products [5] to become associated with Worrell's firm. Gochneaur also learned that one Ernest Bridgman of California, a chemist connected in some way with the Vivian Woodard Company, was Worrell's source of supply for cosmetics. As Gochneaur and his associates had no intention of producing their own cosmetics, they approached Bridgman during February, 1962, and discussed with him the possibility of his producing for Maw-Vack, Inc. Bridgman had produced a liquid makeup, cleansing cream, freshener, moisturizer and night cream for Worrell's firm, and agreed to produce

these and other products for Maw-Vack, Inc. Accordingly, Maw-Vack's first orders were sent to Bridgman in either March or April of 1962. Some time in June, 1962, Maw-Vack, Inc. received the filled orders and began to sell its products under the name Fashion Two Twenty. Mrs. Aubrey McDonald had become associated with Maw-Vack Inc. in April, 1962.

Bridgman continued to produce for Maw-Vack, Inc. until some time in 1964. At that point, Maw-Vack decided that it would save considerable sums by arranging for a producer nearer its home base. The money would be saved in transportation costs, as Maw-Vack's supplier of bottles and containers was in New Jersey and Bridgman in California, thereby necessitating two cross-continental trips for the containers. Maw-Vack, Inc. decided upon Kolmar Laboratories of Port Jervis, New York, as its next source of supply.

During their initial contacts, Bridgman had represented to Gochneaur that he was willing not only to produce the goods for Maw-Vack, Inc. but also to sell the formulae from which he made the products. He wanted $5,000 for ten or eleven formulae, but Gochneaur did not have the money. In the spring of 1962, after the first shipments had been received from Bridgman-Vivian Woodard, samples of the Bridgman products were sent to defendant Steinberg with a request that he attempt to duplicate them. He returned the samples and his attempted copies in June of that year. There is evidence that these and other attempts to duplicate the Bridgman products were unsatisfactory to Maw-Vack, and that subsequently Maw-Vack did indeed purchase the ten or eleven formulae from Bridgman for $5,000.[6]

5. Another direct sales firm, although not with any cosmetic product line.

6. It is to be noted that since its inception, plaintiff's final arbitrator in the testing and approval of its products has been and is Mrs. Aubrey McDonald. Mrs. McDonald simply applies each product to her face and judges whether or not it "feels right." All of the decisions concerning product line are made on this basis. No other more objective standards were used aside from examinations to investigate whether or not a particular product was physically disintegrating, separating, or rotting.

Some time in 1964, Maw-Vack turned these formulae over to Kolmar Laboratories and severed its connections with Bridgman. Kalmar used the formulae to produce cosmetics for Maw-Vack. However, problems arose with the Kolmar products, especially with the liquid makeup and mascara. After the advent of these problems with the Kolmar products, in the summer of 1964, Gochneaur got in touch with defendant Steinberg. Steinberg then visited the Maw-Vack headquarters in Ohio, where he was shown samples of the Kolmar products and given copies of five formulae, being asked by Gochneaur to duplicate the products. Steinberg subsequently produced cosmetics that were acceptable to Maw-Vack, Inc., and became their only supplier of the products in litigation, i. e., liquid makeup, moisturizer, freshener, night cream and cleansing cream.[7] By 1968, Steinberg was producing 19 different products for Maw-Vack, Inc. Production for plaintiff represented approximately 65% of the gross sales of defendant Jericho Laboratories, Inc., Steinberg's company in Setauket, Long Island. Plaintiff's relations with defendant Steinberg will be discussed in more detail, *infra*.

V. G. Gochneaur became Chairman of the Board of Maw-Vack, Inc., in December, 1968, relinquishing the presidency, which devolved upon his son Roger Gochneaur. Some time in that year plaintiff also decided that it would be in the best interests of the company to possess its own manufacturing facilities in Ohio, and planning toward that end was begun. The actual facility itself was finished in 1970 and began production of a limited line of products in the spring of that year.

Plaintiff's business prospered greatly, its gross sales rising from less than $300,000 in 1962 to $8,500,000 in fiscal 1970–71 (ending March 31, 1971). Net income before taxes in the latter year was $1,200,000. Plaintiff's products are distributed throughout the United States and Canada. Plaintiff became a publicly held corporation in August, 1969.

## HISTORY OF THE CONTROVERSY

The defendant, Steinberg, has conducted a business of bottling and packaging various cosmetics under customers' trade names and trade marks since 1953. In 1957, he organized Jericho Laboratories, Inc. (Jericho) and thereafter conducted the business in a corporate name. In the conduct of his business, containers and labels were and are supplied by the customers.

In the fall of 1964, plaintiff stopped doing business with Kolmar Laboratories and engaged the services of Jericho. The plaintiff, at that time, turned over the Bridgman formulae for five basic products: liquid makeup, moisturizer, freshener, cleansing cream and night cream.

In the summer of 1968, Mr. Gochneaur suggested to Steinberg that he come into the employ of the plaintiff, and help plan and set up a plant to manufacture and package the F.T.T. products in Ohio, indicating that at the appropriate time the plaintiff would purchase Jericho, Inc. from Steinberg. Steinberg apparently acted on this suggestion. He became plaintiff's consultant in the construction of plaintiff's plant. He advised it as to physical layout and was instrumental in providing the formulae for producing the various products. In return, Steinberg was elected to the Board of Directors in late 1968 and was given stock options on plaintiff corporation's stock.

Extended discussions and negotiations were conducted with a view to the plaintiff taking over the Jericho plant on either a lease basis or straight purchase. The plaintiff apparently changed its position some time in 1970. Steinberg realized that the negotiations were taking an unfavorable turn when, on April

---

7. Plaintiff also asserts that the Bridgman formula for eye and throat oil was turned over to Steinberg with the other five.

The Court finds that plaintiff does not have a reasonable probability of proving this.

6, 1970, plaintiff, through its counsel and one of its vice presidents, Robert Auer, telephoned Steinberg and offered to retain him on a consulting basis for three years for $40,000 per year. Steinberg was advised that the employment would require him to turn over to the plaintiff all the formulae, manufacturing processes and know-how he had accumulated concerning the fourteen products he had made for plaintiff in addition to the liquid makeup, freshener, moisturizer, cleansing and night creams.

Steinberg's reply to this telephone call was by letter dated April 17, 1970, in which he indicated that the employment terms were acceptable provided the plaintiff purchase all its requirements from Jericho. Steinberg failed or refused to attend any board meetings held after the summer of 1970. On December 3, 1970, at a quarter-annual meeting of the Board of Directors of plaintiff it was resolved not to acquire or lease the Jericho plant. Steinberg was advised of this decision by letter dated December 8, 1970.

Thereafter, additional offers and counteroffers were made concerning Steinberg's future relationship with the plaintiff. The negotiations failed to bring about an agreement. Steinberg resigned from the Board of Directors on April 2, 1971.

■ Plaintiff seeks injunctive relief. In order to be eligible for such relief, the plaintiff must show likelihood of success on the claims for which injunctive relief is appropriate. He must also show that the withholding of the remedy will result in irreparable harm to him. In deciding on the proper relief, the court must consider the balance of hardships between the parties, and the resultant effect on the parties which the granting of the relief would have. Capital City Gas Co. v. Phillips Petroleum Co., 373 F.2d 128, 131 (2d Cir. 1967); Imperial Chemical Industries, Ltd. v. National Distillers & Chemical Corp., 354 F.2d 459, 461 (2d Cir. 1965); Hudson Pulp & Paper Corp. v. Swanee Paper Corp., 223 F.Supp. 617, 618 (S.D.N.Y. 1963); Estee Lauder, Inc. v. Watsky, 323 F.Supp. 1064 (S.D.N.Y.1970).

■ Injunctive relief is an extraordinary remedy and is not to be routinely granted. The Court, in Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944), stated that:

"The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff . . . Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction."

Further, in determining whether preliminary injunctive relief is proper, the court "is not bound to decide doubtful and difficult questions of law or disputed questions of fact." Hershey Creamery Co. v. Hershey Chocolate Corp., 269 F.Supp. 45 (S.D.N.Y.1967).

## PROBABILITY OF SUCCESS—THE ANTITRUST CLAIM

■ Plaintiff claims that the defendants' acts place the plaintiff's very existence in jeopardy. When seen in the light of the actual evidence presented, the court does not find that claim to be substantially correct. The acts complained of with regard to the federal, antitrust, claim are no different than the acts on which the claim of unfair competition is based. Though conduct amounting to unfair competition can also be a *per se* violation of the antitrust laws, it is not necessarily so. The cases cited by plaintiff on this point are clearly irrelevant. Perryton Wholesale, Inc., v. Pioneer Distributing Co., 353 F.2d 618 (10th Cir. 1965), cert. denied 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966), was a review by the Circuit

Court of a final judgment after trial. Caldwell-Clements, Inc., v. Cowan Publishing Corp., 130 F.Supp. 326 (S.D.N.Y. 1955) merely sustained the sufficiency of the complaint, the plaintiff not seeking injunctive relief. In Erie Technological Products, Inc. v. Centre Engineering, Inc., CCH Trade Reg.Rep. (1971 Trade Cases) ¶ 73,756 (M.D.Pa. 1971), the application for a preliminary injunction was denied.

 In considering the granting or withholding of injunctive relief when a claim is based on an antitrust violation, it is proper to consider the comparative economic strength of the parties involved. As Judge Frankel noted in Vogue Instrument Corp. v. Lem Instruments Corp., 40 F.R.D. 497 (S.D.N.Y. 1966), in considering a motion for summary judgment:

> "There remains the postponed question whether, assuming the factual disputes to be resolved for plaintiff, the complaint really states a claim for relief under the Sherman Act. As appears from the forthright submissions on both sides, the case scarcely conveys to 'the expert feel of lawyers,' Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 150, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) a sense of striking, or even familiar, Sherman Act implications. Suing under a statute, it bears remembering, conceived as a weapon against the power of 'trusts' and 'combinations,' see Apex Hosiery Co. v. Leader, 310 U.S. 469, 492–493, 69 S.Ct. 982, 84 L.Ed. 1311 (1940), plaintiff appears to be the comparative giant seeking to suppress a young and infant competitor. And the 'restraints' alleged are a garden variety of unfair competitive practices reachable, and normally reached, under state rather than federal law. [citations omitted]. 40 F.R.D. at 499."

### THE STATE CLAIMS

Claims are alleged for unfair competition, misappropriation and violation of trade secrets, trade defamation, and breach of fiduciary duties as regards defendant Steinberg.

### APPLICABLE LAW

Defendants Marjo, Inc., and Finelle Industries, argue that the law of Indiana and Massachusetts, respectively, is applicable to them. Since they have not shown that the law of those states differs from the law of the State of New York, the court will assume that there is no substantial difference.

In Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774, 780 (2d Cir. 1964), the court held that in an unfair competition claim ". . . the applicable law is the law of New York." The court, in Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614 (2d Cir. 1962), opined that New York and federal law were not essentially different, citing Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 697 (2d Cir. 1961). The court there relied on the "indeterminate general law."

### UNFAIR COMPETITION

 The plaintiff, at oral argument, conceded that the name Fashion Two Twenty had not acquired secondary meaning. (Transcript, pp. 240–241.) Secondary meaning is acquired by the identification in the public mind, over a period of time, of a name, a work or a mark with a specific product or firm. Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495 (2d Cir. 1962).

 The plaintiff makes varied and general claims of confusion, palming off, imitation of the plaintiff's products and manner of packaging, and appropriation of the plaintiff's marks and names. The defendants have offered some proof that beauty consultants and managers associated with them present the buying public with a competitive product denominated as such. In doing so, the beauty consultants and managers state that the product is superior to the Fashion Two Twenty line. It is to be noted, however that instances of palming off or confusion traceable to individual beauty con-

sultants and managers, the proof of which is tenuous, are not to be held against the defendants Marjo, Inc., and Finelle Industries. The latter are not to be construed as principals of the former, the beauty consultants and managers, under the systems of both the plaintiff and the defendants Marjo, Inc., and Finelle Industries, being but independent contractors and not agents.

In order to sustain a claim of unfair competition, the plaintiff must show more than "sharp or unethical business practices." Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569 (2d Cir. 1959). Unfair competition, for which relief is available, is competition which deceives the public or violates the plaintiff's property rights. Norwich Pharmacal Co. v. Sterling Drug, Inc., supra, at 571; Lincoln Restaurant Corp. v. Wolfie's Restaurant, Inc., 291 F.2d 302 (2d Cir. 1961), cert. denied 368 U.S. 889, 82 S.Ct. 143, 7 L.Ed.2d 88.

No deception is practiced on the ultimate consumer in the instant case, nor is any competing product palmed off as the product of the plaintiff. Mere statements that a competing product is as good as plaintiff's do not constitute unfair competition. The containers in which the competing products are sold are similar to the plaintiff's containers. In some cases, they are even the same. However, the bottles, jars and tubes used by both plaintiff and defendants are standard in the industry. Many other directly competitive products are sold in exactly the same jars, bottles and tubes. The labels, moreover, clearly indicate the different sources of the products.

The plaintiff's substantial claim of unfair competition is based on the theory of misappropriation of good will. The beauty consultants and managers previously associated with plaintiff and now associated with defendants Marjo, Inc. and Finelle Industries, have built up a substantial reservoir of good will with the various clients they service and in the general areas in which they are located. Plaintiff is essentially claiming this good will as its own, in addition to any specific good will attaching directly to its products. Nevertheless, plaintiff has shown no right in the former variety of good will. That good will was created through the efforts of the beauty consultants and managers, as independent contractors. Plaintiff did not participate, either physically or financially, in the building up of this good will. It is to be noted that plaintiff did not contribute in any way to the efforts of lower level distributors to publicize or advertise Fashion Two Twenty products. The beauty consultants and managers thus have their own property rights in the good will attributable to their own distributorships, and this good will cannot be claimed by plaintiff. As to the good will attaching to plaintiff's products themselves, the court has already noted that defendants label their products in a distinctively different way, and that there is thus no "free ride" misappropriation taking place.

Plaintiff further argues that defendants Marjo, Inc. and Finelle Industries must be held to a higher duty than other competitors, due to the prior relationship of the principals of the defendant corporations with plaintiff. This is not a separate cause of action, but merely serves to heighten the duty owed by defendants if such a duty is demanded by the law. However, the court does not find the authorities cited by the plaintiff to be persuasive. In Flexitized, Inc. v. National Flexitized Corp., 214 F.Supp. 664 (S.D.N.Y.1963) aff'd. 335 F.2d 774 (2d Cir. 1964); Frederick Chusid & Co. v. Marshall Leeman & Co., 279 F.Supp. 913 (S.D.N.Y.1968) and Duane Jones Co. v. Burke, 306 N.Y. 172, 177, 117 N.E. 2d 237 (1954), the defendants had all previously been agents of the plaintiff. That was not the case here, either for the defendants Marjo, Inc. and Finelle Industries, or for any of the beauty consultants and managers. Their contracts and agreements specifically stated that the distributors of plaintiff's products were to be considered independent contractors, rather than agents. The finan-

cial dealings between plaintiff and defendants Marjo, Inc., and Finelle Industries were always on a cash basis, no credit being extended. By the terms of their agreements, defendants Marjo, Inc. and Finelle Industries had to, and from the evidence, did, hold plaintiff harmless for any of the costs of distribution. They were not allowed to, and did not, hold themselves out as being agents of plaintiff.

A. S. Rampell, Inc., v. Hyster, Co., 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E. 2d 371 (1957), cited by plaintiff, is not really in point. In that case the New York Court of Appeals held that plaintiff had stated a cause of action when it alleged that defendant had been in a relation of confidence with it, and had by its actions breached the duties arising out of that relationship. The holding in *Rampell* does not advance plaintiff's argument here, as this court finds, on the basis of the facts submitted, that while plaintiff may have stated a claim, it is improbable that it will be able to prove its allegation of a relation of confidence at trial. In *Rampell* the court was moved by the showing of the economically dominant character of defendant in its relation with plaintiff. Plaintiff here does not allege as much, and could not, on the facts known to the court, prove such a dominance. If any party was dominant in the relationship here under study, it was plaintiff. New York courts have not yet expanded upon *Rampell* to the point where this court could say that where a relationship of domination gives rise to fiduciary duties those duties run from the dominated party to the party dominating. Such an interpretation would be a perversion of the spirit of *Rampell*.

## TRADE DEFAMATION

Plaintiff has alleged that on many occasions defendants and their agents libelled plaintiff and its products. Plaintiff seeks preliminary injunctive relief against such conduct, citing Wolf v. Gold, 9 A.D.2d 257, 193 N.Y.S.2d 36 (1st Dept.1959).[8] Injunctive relief against trade libel is generally unavailable both under the law of this Circuit, American Malting Co. v. Keitel, 209 F. 351 (C.C.A. 2d 1913) and under state law. Marlin Firearms Co. v. Shields, 171 N.Y. 384, 64 N.E. 163 (1902); Singer v. Romerrick Realty Corp., 255 A.D. 715, 5 N.Y.S.2d 607 (2d Dept.1938); Advance Music Corp. v. American Tobacco Co., 268 A.D. 707, 53 N.Y.S.2d 337, 341–342 (1st Dept. 1946) rev'd. on other grounds 296 N.Y. 79, 70 N.E.2d 401 (1946); University of Notre Dame DuLac v. Twentieth Century-Fox Film Corp., 22 A.D.2d 452, 256 N.Y.S.2d 301, 307 (1st Dept.1965), aff'd. 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965); Dartmore Corp. v. Columbia Products Corp., Sup., 18 N.Y. S.2d 366 (1939); Schutzman & Schutzman v. News Syndicate Co., 60 Misc.2d 827, 304 N.Y.S.2d 167 (S.Ct.1969).

There are exceptions to this rule. In American Malting Co. v. Keitel, *supra,* the court stated that injunctive relief would be proper where the defendant was shown to have intimidated the customers or agents of plaintiff through threats and threatening conduct. The court noted that such threats could be enjoined. (209 F. at 356). See also Adriance, Platt & Co. v. National Harrow Co., 121 F. 827 (C.C.A.2 1903). Wolf v. Gold, 9 A.D.2d 257, 193 N.Y.S.2d 36 (1st Dept. 1959), cited by plaintiff, was an appeal from a denial of a motion to dismiss the complaint. An action had been brought solely to enjoin the defendants from

8. Plaintiff assumes that state law is applicable to determine whether or not injunctive relief is proper in the instant case. Although the court has doubts as to whether state law is controlling on this point, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *see* Guaranty Trust Co. of New York v. York, 326 U.S. 99, 106, 65 S.Ct. 1464, 1468–1469, 89 L.Ed. 2079 (1945), there is no need to explore the subject further as the result, under the facts of this case, would be the same under both state and federal law.

libelling and slandering plaintiffs' business. The Appellate Division was presented with the question of whether such a complaint, seeking only injunctive relief, stated a cause of action. The court there found that a cause of action had been stated and that the denial of the motion to dismiss had been correct.

In *Wolf*, the defendants, part owners of a business along with the individual plaintiff, were charged in the complaint with attempting to decrease the value of the business through defaming it so as to be able to buy out the individual plaintiff's share at a lower price than that originally demanded. The court stated that

> "If it appears, as alleged in the first cause of action, that the defendants by false statements and other illegal means are engaged upon a deliberate plan to destroy the business and reputation of plaintiffs, and that plaintiffs' legal remedy is inadequate, then the basis for injunctive relief will have been established." 193 N.Y.S. 2d at 38.

The court attempted to clarify its position by going on to state that "Equity will not restrain the publication of unjust and malicious matter simply on a showing of falsity." 193 N.Y.S.2d at 38. Rather, defamation could only be enjoined where it accompanied other tortious acts and where equitable relief would be the sole means of preserving business or property interests.

■ This court finds that the factual tests of American Malting Co. v. Keitel, *supra*, have not been met by plaintiff's evidence in the instant case, and that Wolf v. Gold, *supra*, is not in point. No threats or threatening conduct on the part of defendants have been shown, taking this case out of the possible exceptions to the general rule stated in *American Malting*. Wolf v. Gold, dealing as it did with the propriety of injunctive relief after trial on the merits, does not sustain plaintiff's application here. Further, assuming, *arguendo*, that Wolf v. Gold, *supra*, is relevant, plaintiff has not shown that defendants' alleged acts are of such a serious and widespread nature that injunctive relief, as opposed to damages, is the sole or essential means of obtaining any relief. Accordingly, no injunctive relief will issue with regard to plaintiff's claims of trade defamation.

### THE TRADE SECRET CLAIM

■ Plaintiff claims that defendants Steinberg and Jericho Laboratories are using its trade secrets in the production of cosmetics for the other defendants. The specific trade secrets involved are the five Bridgman formulae turned over to Steinberg by plaintiff in the fall of 1964. There is substantial evidence that the formulae currently being used by Steinberg in producing for the other defendants are not the same as those previously turned over to him. Whether or not these formulae in present use are so derivative of the Bridgman formulae is in dispute. The evidence presented by both plaintiff and defendants is highly complex. Preliminary injunctive relief would be inappropriate.

### THE BREACH OF FIDUCIARY DUTY CLAIM

■ Plaintiff claims that defendant Steinberg, who was a director of plaintiff until April 2, 1971, breached his fiduciary duty to plaintiff by agreeing to produce cosmetics for the other defendants prior to that date. Whether or not this is true, it is evidently not a continuing tort, and legal relief after trial will be all the relief necessary.

Plaintiff declined the offer of a trial on the merits at the return day of the motion. The court offers plaintiff an early trial.

### SUMMARY AND ORDER

1. The defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

2. The defendants' motion to dismiss for lack of personal jurisdiction is granted as to all individual defendants with

the exception of Steinberg; as to all others it is denied;

3. Defendants' motion to strike certain matter in the pleadings as scandalous and immaterial is denied.

4. Plaintiff's motion for a preliminary injunction is denied and it is

So ordered.

Findings of fact and conclusions of law are contained in this opinion in accordance with the provisions of Rule 52 F.R.Civ.P.

## APPENDIX A

15 U.S.C. § 1. Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1–7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corpora-

tions in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

§ 15. Suits by persons injured; amount of recovery.

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

§ 26. Injunctive relief for private parties; exception.

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided,* That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, in respect of any matter

subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission.

## APPENDIX B

28 U.S.C. § 1337. Commerce and antitrust regulations

The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

## APPENDIX C

### FRANCHISE AGREEMENT

This agreement made and entered into this day of 19 , by and between MAW-VACK, INC., an Ohio Corporation hereinafter referred to as party of the first part and hereinafter referred to as party of the second part witnesseth:

Whereas the party of the first part presently is in the business of selling cosmetic items and other items of similar type of nature and whereas the party of the second part is desirous of purchasing from the party of the first part the right and privilege of selling said items in the following area:

which area the party of the first part covenants contains not less than a population of 250,000 (two-hundred fifty thousand) people.

The party of the first part further agrees that it will not establish another directorship in the area above described or authorize or permit the establishment or maintenance of a studio therein by any one other than the party of the second part.

It is mutually agreed as follows: in consideration of the sum of to be paid by the party of the second part to the party of the first part as follows:

the party of the first part does hereby sell to the party of the second part a directorship in the area above described, and the party of the second part in consideration of the sale to the party of the second part of said directorship does covenant and agree that the party of the second part will abide by all of the rules and regulations governing directorship, as set forth by the party of the first part in its manual, which party of the second part has read and understands; that the party of the second part will further maintain a studio according to the plans and requirements of the party of the first part towards the sale of said items.

The party of the first part does further agree that the party of the second part shall be privileged to purchase at 10% discount from listed prices all Samples, Sales Aids, Literature and Hostess Gifts.

The party of the first part does further agree that the party of the second part shall be privileged to purchase Fashion Two Twenty products for resale to the public at 66% discount of retail.

The party of the first part does further agree that the party of the second part shall have the right to recommend additional directors to the party of the first part and if the same are accepted by the party of the first part the party of the second part shall be entitled to receive 50% of the franchise fee paid to the party of the first part at such times as the new franchised directors pay said sums.

I agree to open a studio on or before

In witness whereof the parties have executed duplicates of this agreement the day and year first above written.

MAW-VACK, INC.

Witnesses:

By ——————————
 Party of first part

——————————
Party of second part

AGREEMENT NOT TO COMPETE
This agreement made and entered into this day of 19 by and between MAW-VACK, INC. an Ohio Corporation authorized to do business in the State in which the DIRECTORSHIP is being authorized this date, hereinafter referred to as FIRST PARTY and

of ......... hereinafter referred to as SEC-OND PARTY witnesseth:

That whereas the SECOND PARTY is desirous of procuring a DIRECTOR-SHIP as defined by the FIRST PARTY, the rights arising thereunder being acknowledged by the SECOND PARTY and whereas the SECOND PARTY does further acknowledge that the information, methods and procedures which will be conveyed to him as a DIRECTOR are of a highly confidential nature and cannot be adequately compensated for by money judgement alone, now therefore THE SECOND PARTY agrees that in consideration of the FIRST PARTY granting to him a DIRECTORSHIP as defined between the parties and in a manual known as "HOW MANUAL" a copy of which the DIRECTOR has received that he will not either directly, or indirectly or as a member of any film, partnership, corporation or as an employee thereof or of any of the foregoing COMPETE in the same or similar type of business within the United States for a period of (3) three years from the retirement, resignation or termination of the DIRECTORSHIP.

It is Further understood and agreed that the FIRST PARTY may procure injunctive relief as well as money damages for a violation of this agreement.

At any place in this agreement that the term he appears as pertaining to the SECOND PARTY it shall mean, he, she, a partnership designation or corporate designation.

In witness whereof we have executed duplicates of this agreement the day and year first above written.

SIGNED IN THE PRESENCE OF:

 FIRST PARTY

 MAW-VACK, INC.

 By

 SECOND PARTY

 By

I ACKNOWLEDGE RECEIPT OF A SIGNED COPY OF THIS AGREEMENT.